**Elmer H. SWANSON; Livingston Silver, Inc., Plaintiffs–Appellants,**

v.

**Bruce BABBITT, Secretary of the United States Department of the Interior; Mike Espy, Secretary of the United States Department of Agriculture,\* Defendants–Appellees.**

**No. 91–36341.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 9, 1993.

Decided Sept. 3, 1993.

---

\* Bruce Babbitt and Mike Espy, successors to Cecil D. Andrus and Robert Bergland as Secretaries of the Interior and Agriculture respectively, are

John B. Ingelstrom, Racine, Olson, Nye, Cooper & Budge, Pocatello, ID, for plaintiffs-appellants.

Jacques B. Gelin, Environment and Natural Resources Div., U.S. Dept. of Justice, Washington, DC, for defendants-appellees.

substituted as defendants-appellees in this case.

Fed.R.App.P. 43(c)(1).

Before: BRUNETTI, LEAVY and TROTT, Circuit Judges.

TROTT, Circuit Judge:

The major issue presented by this case is whether the provisions of the Sawtooth National Recreation Area Act, 16 U.S.C. § 460aa *et seq.*, preclude the issuance of mill site patents, even though the patent applications for those sites were pending at the time of the enactment of the Act. We hold that the provisions of the Sawtooth National Recreation Area Act expressly preclude the issuance of any patents on protected land after the date of the Act's passage. We further hold that a patent right does not vest upon the submission of a patent application if the Secretary of the Interior contests the validity of the patent application and thus delays its issuance.

I

BACKGROUND

This case involves the patenting of mining claims and mill sites under the General Mining Law of 1872, 30 U.S.C. § 21 *et seq.* Under the provisions of the Mining Act, an individual may enter and explore land in the public domain in search of valuable mineral deposits. After minerals are discovered, the claimant may file a "mining claim" with the Bureau of Land Management (BLM), which if approved, entitles the claimant to the right of exclusive possession of that claim, as long as the requirements of the Mining Act are met. Although ownership of a mining claim does not confer fee title to the claimant, the claimant does have the right to extract all minerals from the claim without paying royalties to the United States. In addition, a claimant may file a claim for a "mill site," which is "nonmineral land ... [which] is used or occupied by the proprietor ... for mining or milling purposes." 30 U.S.C. § 42(a). A mill site is a tract of land, not to exceed five acres, on which can be placed processing facilities and other structures used to support the extraction of minerals from the claim. A claimant must follow essentially the

same process to obtain a mill site as a mining claim.

■ An individual who possesses a valid mining claim may go through an additional process to obtain a patent, "thereby purchasing from the Federal Government the land and minerals and obtaining ultimate title to them. Patenting, however, is not required, and an unpatented mining claim remains a fully recognized possessory interest." *United States v. Locke*, 471 U.S. 84, 86, 105 S.Ct. 1785, 1788, 85 L.Ed.2d 64 (1985); 30 U.S.C. § 29. A patented mining claim is one in which the government has passed its title to the claimant, giving him exclusive title to the locatable minerals, and, in most cases, the surface and all resources. At any time prior to the issuance of a patent, the government may challenge the validity of the mining claim and, if successful, the claim will be cancelled with all rights forfeited. Mill sites may also be patented. 30 U.S.C. § 42(a).

In the early 1960's, appellant Elmer Swanson purchased from a silver mining company several patented mining claims, a number of unpatented claims, and a corresponding number of mill sites all located within the state of Idaho. These claims and sites lie within the Challis National Forest, in what is now the Sawtooth National Recreation Area. On April 21, 1967, Swanson applied for patents for the unpatented claims and mill sites. Following the filing of the application for patents, the BLM lodged complaints in 1968 and 1971 contesting the validity of the mill site claims. The BLM maintained the requested mill sites were not being used for mining and milling purposes and that the sites were not laid out in as reasonable and regular a form as practicable.

The Administrative Law Judge (ALJ) hearing the complaint in July 1972 invalidated the unpatented mining claims, but generally sustained the validity of the mill sites. On appeal, the Interior Board of Land Appeals (IBLA)[1] affirmed the invalidation of

---

1. "The Interior Board of Land Appeals is part of the Office of Hearings and Appeals which is a component of the Office of the Secretary of the Interior. It is authorized to hear, consider, and

the claims, but reversed the ALJ and concluded the mill sites did occupy more land than was necessary. Before rendering a final decision, the IBLA requested that both sides submit amended mill site plans to conform to the necessary land requirements. Swanson refused to amend the sites, however, and the IBLA adopted the United States Forest Service's recommendations and greatly reduced the size of seven of the mill sites on January 16, 1974. Although this case initially involved both mining claims and mill sites, the only issue before this court is the patentability of these seven mill sites.[2]

Swanson appealed the IBLA's decision to the district court. On June 3, 1982, the court reversed the IBLA's invalidation of four of the seven mill sites, because it concluded the IBLA did not take into account all necessary uses of the mill site locations when it determined the reasonable size necessary for those sites. The court did uphold the partial invalidation of three of the other mill sites. The IBLA reconsidered its assessment and, on July 14, 1986, determined two of the four remanded claims were invalid. Swanson again appealed to the district court, but before a decision was rendered, the parties reached a settlement agreement on April 4, 1991. The agreement settled a number of the other disputed mining claims between the parties in addition to the mill site claims at issue. In the portion of the settlement relevant to this appeal, Swanson agreed to reduce in size by seventy five feet each of the seven mill site locations at issue in this appeal.

This amaranthine litigation would have mercifully concluded with that settlement agreement were it not for an intervening Act of Congress. On August 22, 1972, Congress enacted the Sawtooth National Recreation Area Act (SNRA), 16 U.S.C. §§ 460aa *et seq.*, which expressly terminated the ability of individuals to establish mining claims and mill

sites, and also terminated the ability of existing claimholders to proceed to patent upon claims already located in the Recreation Area. 16 U.S.C. §§ 460aa–9, 460aa–11. Swanson's claims are included entirely within the boundaries of the Recreation Area.

Because Swanson had applied for but had not been issued his patents before the enactment of the SNRA, the district court in 1982 upheld the IBLA's 1974 denial of his patent, stating:

> It appears evident that the purpose of [the provisions of the SNRA] was meant to prevent any further patenting of land within the Sawtooth National Recreation Area. The Board's interpretation of the statute establishing the Sawtooth National Recreation Area appears to be well considered and proper. The Court will not reconsider the Board's holding. While the plaintiffs [sic] may well have filed for a patent on his claims before the statute establishing the Sawtooth National Recreation Area was passed, he had not completed the process when the Secretary's authority to issue patents was suspended. Thus, the Board was correct in not permitting the mill sites to go to patent.

The district court's judgment order on July 1, 1991, which approved the settlement agreement, did not disturb the court's 1982 determination that Swanson could not obtain patents on his mill sites. Swanson now appeals that determination.

## II

### PATENTABILITY OF MILL SITES

In determining whether the SNRA prohibits the granting of Swanson's requested patents, the court should first look to the plain language of the statute. "We must uphold an agency's construction of a statute if it is consistent with the unambiguous language of

determine matters within the jurisdiction of the Department of the Interior involving hearings, appeals, and other review functions of the Secretary of the Interior." *Brandt–Erichsen v. United States Dept. of the Interior,* 999 F.2d 1376, 1379 n. 1 (9th Cir.1993).

**2.** The seven mill sites at issue are named High Tariff, Clara, Little Falls, Livingston, May, Trenvsvalle, and Deadwood.

Congress, or if the statute is ambiguous, if it is reasonable." *Webb v. Lujan*, 960 F.2d 89, 92 (9th Cir.1992) (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)). "The interpretation of a statute by the agency charged with its administration is generally entitled to 'considerable weight.'" *Bolt v. United States*, 944 F.2d 603, 606 (9th Cir.1991) (quoting *Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782). "The court's starting period thus must be the language employed by Congress." *Seldovia Native Ass'n, Inc. v. Lujan*, 904 F.2d 1335, 1341 (9th Cir.1990) (quotations omitted).

Two provisions of the Sawtooth National Recreation Area Act apply in this case. The provision known as "Section 10" states:

> Subject to valid existing rights, all Federal lands located in the recreation area are hereby withdrawn from all forms of location, entry, and patent under the mining laws of the United States.

16 U.S.C. § 460aa–9. This provision withdraws the land within the SNRA from all future mining claims. "Section 12," which applies to Swanson's claims, extinguishes the right of existing claim holders to proceed to patent on any claim already established within the SNRA. That provision states:

> Patents shall not hereafter be issued for locations and claims heretofore made in the recreation area under the mining laws of the United States.

16 U.S.C. § 460aa–11. The effective date of the SNRA was August 22, 1972.

■ The plain language of the statute precludes the issuance of a patent to Swanson after 1972, regardless of when the application was filed. Section 12 states no patents will "hereafter be issued," even on claims which had "heretofore" been established. The legislative history of the SNRA indicates Congress recognized this provision would extinguish a claimant's existing right to patent. As one Congressman noted: "As I have pointed out, any person holding a valid claim is entitled to proceed to patent and thereby acquire fee title to the lands involved. Section 12, in effect, extinguishes that right with

respect to lands located within the recreation area." 118 Cong.Rec. 1256 (1972). The IBLA's interpretation and application of the SNRA is not inconsistent with Congress's clear direction in the language of the Act: no patents can be issued after August 22, 1972, regardless of when the mining claims were actually made. "If the intent of Congress is clear, the court must give effect to that intent." *Seldovia*, 904 F.2d at 1341 (quotations omitted).

■ There is no question the government has the authority to withdraw public lands from mining upon the establishment of National Recreation Areas. Until a patent is issued, the government has broad authority to manage public lands. "Prior to patent the Secretary retains jurisdiction over public lands." *Reed v. Morton*, 480 F.2d 634, 642 (9th Cir.), *cert. denied*, 414 U.S. 1064, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973). "[I]t has long been recognized that the Secretary of Interior has broad plenary powers over the disposition of public lands." *Ideal Basic Industries, Inc. v. Morton*, 542 F.2d 1364, 1367 (9th Cir.1976). The government may also withdraw public lands from mining under the Mining Act. "Only where the United States has indicated that the lands are held for disposal under the land laws does the [Mining Act] apply; and it never applies where the United States directs that the disposal be only under other laws." *Oklahoma v. Texas*, 258 U.S. 574, 600, 42 S.Ct. 406, 416, 66 L.Ed. 771 (1922). Thus, until Swanson's patent was actually issued, the government retained broad authority to remove those public lands from mining claims and patents, as it did in 1972.

We hold the IBLA properly rejected Swanson's patent application because the plain language of the SNRA prohibits the issuance of any patent on mining claims or mill sites after August 22, 1972.

## III

### PROPERTY INTEREST

■ The conclusion the SNRA precludes the issuance of all patents after 1972 does not end our analysis. Swanson argues

he had a vested patent right as of the date of application and therefore the SNRA's extinguishment of patent rights affected a taking of his property without compensation, in derogation of his rights under the Fifth Amendment. Swanson is correct in asserting that vested patent rights constitute property. Federal mining claims are "private property" which enjoy the full protection of the Fifth Amendment. *Freese v. United States,* 639 F.2d 754, 757, 226 Ct.Cl. 252 *cert. denied,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 103 (1981); *Oil Shale Corp. v. Morton,* 370 F.Supp. 108, 124 (D.Colo.1973). Furthermore, "the divestment of a vested right to a patent is tantamount to divestment of the patent itself, i.e. a divestment of 'property.'" *Freese,* 639 F.2d at 758 (citing *Benson Mining and Smelting Co. v. Alta Mining and Smelting Co.,* 145 U.S. 428, 433, 12 S.Ct. 877, 879, 36 L.Ed. 762 (1892)). Because Section 12 of the SNRA prohibits the issuance of all patents, if Swanson had a vested right to those patents, he would have a claim for compensation under the Fifth Amendment for the taking of his property.

█ The question we must resolve, then, is whether Swanson had a vested right to a patent at the time of the SNRA's enactment on August 22, 1972. The right to a patent accrues when the claimant has filed a proper patent application and has paid his fee, regardless of when the Department of the Interior fulfills its purely administerial function of issuing the patent. Other courts have recognized the Department's approval of a valid patent application is non-discretionary and is purely a "ministerial act." *See South Dakota v. Andrus,* 614 F.2d 1190, 1193–1194 (8th Cir.), *cert. denied,* 449 U.S. 822, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980). Once a valid application has been made, "'the holder of a valid mining claim has an absolute right to a patent ... and the actions taken by the Secretary of the Interior in processing an application for patent by such claimant are not discretionary; issuance of a patent can be compelled by court order.'" *Id.* at 1193 n. 3 (quoting *United States v. Kosanke Sand Corp.,* 12 IBLA 282, 290–91 (1973)). *See also Wilbur v. United States,* 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (1930) (issuing writ of mandamus ordering Secretary to confer mineral patent to a claimant who had successfully demonstrated compliance with the statutory prerequisites).

For a patent right to vest upon application, however, the patent application must have been *valid* under existing law and the delay in the patent issuance must have been attributed to mere administerial delay in processing the otherwise valid application. The validity of Swanson's application in this case, however, was contested by the Department. The Department determined Swanson was seeking more land for his mill sites than was necessary for the mining operations.

The Secretary of the Interior has a responsibility to ensure patent applications comply with existing law.

> The locator of a mining claim ... holds his claim by virtue of an Act of Congress. Upon compliance with the requirements of the mining laws, he is entitled to a patent, and the Secretary has no discretion to deny an application for a mineral patent *where all the requirements of law have been met.* Thus, in the mining laws, Congress chose a method of disposing of public lands whereby the recipient of the grant had only *to prove that he met the requirements of the law* in order to have the rights he obtained by location confirmed by patent. The power confided by the Secretary with respect to the issuance of mineral patents is not that of granting or denying a privilege but of determining whether an existing privilege conferred by Congress has been lawfully exercised.... Nevertheless, *the Secretary is not authorized to issue a patent until he is satisfied that the requirements of the law have been complied with.*

*South Dakota v. Andrus,* 462 F.Supp. 905, 906 (D.S.D.1978), *aff'd,* 614 F.2d 1190 (8th Cir.1980) (quoting 2 *The American Law of Mining* § 9.04 at 284–85) (emphasis added).

> [N]o right arises from an invalid claim of any kind. All must conform to the law under which they are initiated; otherwise they work an unlawful private appropriation in derogation of the rights of the public.

Of course, the land department has no power to strike down any claim arbitrarily, but so long as the legal title remains in the Government it does have power, after proper notice and upon adequate hearing, to determine whether the claim is valid and, if it be found invalid, to declare it null and void.

*Cameron v. United States,* 252 U.S. 450, 460, 40 S.Ct. 410, 412, 64 L.Ed. 659 (1920). "The law is well-settled that this vested right does not arise until there has been full compliance with the extensive procedures set forth in the federal mining laws for the obtaining of a patent." *Freese,* 639 F.2d at 758.

In *Benson Mining and Smelting Co. v. Alta Mining and Smelting Co.,* 145 U.S. 428, 12 S.Ct. 877, 36 L.Ed. 762 (1892), the Supreme Court decided that as long as the claimant had complied with applicable claims laws up to the point where the patent application was filed, his failure to adhere to those regulations applying to unpatented claims after the application was filed but before the actual patent was issued did not invalidate his claim. The Court determined his patent rights had vested upon his submitting a valid patent application and proper payment:

In other words, when the price is paid the right to a patent immediately arises. If not issued at once, it is because the magnitude of the business in the Land Department causes delay. But such delay, *in the mere administration of affairs,* does not diminish the rights flowing from the purchase, or cast any additional burdens on the purchaser, or expose him to the assaults of third parties.

*Id.* at 431–32, 12 S.Ct. at 879 (emphasis added). The Court went on to state: "[A] party *who has complied with all the terms and conditions* which entitle him to a patent for a particular tract of public land, acquires a vested interest therein, and is to be regarded as the equitable owner thereof." *Id.* at 433, 12 S.Ct. at 879 (citing *Wirth v. Branson,* 98 U.S. 118, 8 Otto 118, 25 L.Ed. 86 (1878) (quotations omitted)).

The Secretary, as he is required to do by law, contested the validity of Swanson's patent application. There is no evidence the Department's protests were made in bad faith or were deliberately designed to delay the processing of Swanson's claims until the enactment of the SNRA. When the matter was finally resolved in 1986, Swanson agreed to mill site locations smaller in size than the sites he had initially requested in 1967. Because the delay in the issuance of Swanson's patent application was not attributable to the Department's purely ministerial and administrative functions but resulted from the Department's challenge of the size of Swanson's mill site requests, whatever patent rights Swanson might have possessed did not vest until the resolution of those claims in 1986.

Because Swanson's patent rights did not vest before the passage of the SNRA, the prohibition on the issuance of patents did not deprive Swanson of any cognizable property interest. The United States Court of Claims has already determined the SNRA's prohibition on the issuance of patents does not take "property" where the claimant has been deprived of only the future option to apply for a patent. *Freese,* 639 F.2d at 758. "At best, plaintiff has suffered a denial of the opportunity to obtain greater property than that which he owned upon the effective date of the Sawtooth Act. This cannot fairly be deemed the divestment of a property interest, save by the most overt bootstrapping." *Id.*

## IV

## CONCLUSION

The plain language of the provisions of the Sawtooth National Recreation Area Act prohibits the issuance of any patents on mining claims within the confines of the Recreation Area after the effective date of that Act on August 22, 1972. Thus the Department of the Interior correctly denied Swanson's patent request after that date. Furthermore, the delay in the issuance of Swanson's patent application was due to the Department's challenge to the validity of that application, because Swanson had requested more land for his mill sites than the Department determined was minimally necessary to support his mining operations. As a result, Swanson's patent rights did not vest upon the filing of his patent application in 1967, but

instead would have vested in 1986 when his application was perfected, some fourteen years after the enactment of the SNRA. Thus the SNRA's prohibition on the issuance of future patents did not deprive Swanson of any cognizable property interest.

The district court's order is hereby AFFIRMED.