**Richard P. COOK, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 94–344L.

United States Court of Federal Claims.

March 14, 1997.

Sarah M. Singleton, Santa Fe, New Mexico, for plaintiffs. Galen M. Buller and R. Bruce Frederick, of counsel.

Gerald S. Fish, Washington, D.C., for defendant.

## OPINION

ANDEWELT, Judge.

### I.

In this takings action, plaintiffs, Richard P. Cook, Shirley A. Cook, Deborah Cantrap, and Kelly Armstrong, seek compensation from the United States under the Fifth Amendment's prohibition against the government taking private property for public use without providing just compensation. Plaintiffs contend that the enactment of the Jemez National Recreation Area Act (JNRAA), Pub.L. No. 103–104, 107 Stat. 1075 (codified at 16 U.S.C. § 460jjj), which prohibits the Bureau of Land Management (BLM) from granting any new patents on public lands located within the Jemez National Recreation Area in Sandoval County, New Mexico (the Recreation Area), constitutes a taking of plaintiffs' property. Plaintiffs contend that at the time the JNRAA was adopted, plaintiffs possessed equitable title to land located within the Recreation Area and that the JNRAA eliminated that title without providing just compensation. This action is before the court on cross-motions for summary judgment. For the reasons set forth below, plaintiffs' motion for partial summary judgment is denied in part and defendant's cross-motion for summary judgment is denied.

### II.

The Mining Act, 30 U.S.C. §§ 21–54, authorizes citizens of the United States to explore and purchase public lands that contain valuable mineral deposits. Section 22 of the Mining Act provides:

> Except as otherwise provided, all valuable mineral deposits in lands belonging to the United States ... shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States ... under regulations prescribed by law, and according to the local customs or rules of miners in the several mining districts, so far as the same are applicable

and not inconsistent with the laws of the United States.

A prerequisite to a United States citizen securing any property interest in public lands is the discovery of a valuable mineral deposit. 30 U.S.C. §§ 22, 29. A citizen who makes such a discovery potentially can secure two pertinent types of property interests in the land—a mining claim and a patent for the land. A mining claim leaves title to the land in the United States and provides the locator with "the exclusive right of possession and enjoyment of all the surface [land]" and the minerals thereunder. 30 U.S.C. §§ 26, 35; *Union Oil Co. of California v. Smith,* 249 U.S. 337, 349, 39 S.Ct. 308, 311, 63 L.Ed. 635 (1919).[1] A patent provides the locator with fee simple title in the land. *Benson Mining & Smelting Co. v. Alta Mining & Smelting Co.,* 145 U.S. 428, 430, 12 S.Ct. 877, 878, 36 L.Ed. 762 (1892).

A citizen can secure a mining claim by "discovering" a valuable mineral on open public land and by "locating" the discovered lands. *Cole v. Ralph,* 252 U.S. 286, 296, 40 S.Ct. 321, 326, 64 L.Ed. 567 (1920); *Gwillim v. Donnellan,* 115 U.S. 45, 49, 5 S.Ct. 1110, 1111–12, 29 L.Ed. 348 (1885). To "locate" the land, the citizen must comply with all federal statutory and regulatory requirements and any additional applicable state requirements. 30 U.S.C. § 28. Federal requirements include, *inter alia,* posting a notice of location on the land and assuring that the location is "distinctly marked on the ground so that its boundaries can be readily traced." 30 U.S.C. § 28.[2] Beginning in 1976, the federal government added a recordation requirement for mining claims. Thereunder, a mining claim is deemed abandoned if the locator fails to file with the BLM information describing where and when the mining claim was located. 43 U.S.C. § 1744; 43 C.F.R. § 3833.1.

A citizen can secure a patent by fulfilling the requirements for a mining claim plus certain additional requirements. *Inter alia,* the citizen must publish notice in a newspaper that an application for a patent has been made so as to provide third parties with an opportunity to raise adverse claims. 30 U.S.C. 29. If no adverse claims are raised, Section 29 creates an assumption that the applicant is entitled to a patent. Section 29 provides:

> If no adverse claim shall have been filed with the register of the proper land office at the expiration of the sixty days of publication, it shall be assumed that the applicant is entitled to a patent, upon the payment to the proper officer of $5 per acre, and that no adverse claim exists; and thereafter no objection from third parties to the issuance of a patent shall be heard, except it be shown that the applicant has failed to comply with the terms of [the pertinent sections] of this title and ... of Title 43.

### III.

On September 29, 1989, after locating pumice on public lands located within the Recreation Area and taking actions to comply with the applicable statutory and regulatory requirements pertaining to such a discovery, plaintiffs filed an application for a patent with respect to 23 placer mining claims covering approximately 1,692.2 acres. Plaintiffs published notice of their application and no adverse claims were filed within 60 days after publication. Approximately 15 months after plaintiffs filed their application, on January 16, 1991, the BLM accepted plaintiffs' payment of the statutory purchase price for a patent ($4,232.50). Plaintiffs thereafter received a copy of BLM Form 1860–1, entitled "MINERAL ENTRY FINAL CERTIFICATE" (the final certificate).

The final certificate contained two parts (hereinafter referred to as the first half and second half). The first half identified the

---

1. To maintain this exclusive right, Section 28 of the Mining Act requires the locator to perform $100 worth of labor or improvements on the land each year. For the years 1994 through 1998, in lieu of the assessment work required by Section 28, subsection 28f(a) requires the locator to pay a $100 maintenance fee for each claim.

2. Location is made by "staking the corners of the claim, except for placer claims described by legal subdivision where State law permits locations without marking the boundaries of claims on the ground." 43 C.F.R. § 3831.1.

land over which the applicant sought a patent, indicated that the applicant had paid the filing fee and deposited the statutory purchase money for the patent, and stated: "THEREFORE: Patent may issue if all is found regular and upon demonstration and verification of a valid discovery of a valuable mineral deposit and subject to the reservations, exceptions, and restrictions noted herein." The second half stated that the mining claims listed below "are hereby approved for patent, subject to the reservation(s) indicated below." The second half contained no statement, as did the first half, that the patent may issue only "if all is found regular."

The first half of the final certificate was completed and signed by an authorized BLM officer on January 16, 1991, and listed no pertinent reservations, exceptions, or restrictions. The second half, however, was never completed or signed by an authorized BLM officer. During the period between the issuance of the first half of the certificate and the enactment of the JNRAA on October 12, 1993, the BLM never undertook a mineral examination to verify that plaintiffs had discovered valuable mineral deposits on the land described in plaintiffs' patent application.

## IV.

The JNRAA leaves intact any lawful mining claim that plaintiffs have over the land in issue. 16 U.S.C. § 460jjj–2(b), (d). Section 3(a) of the JNRAA, however, bars the BLM from issuing any new patents on that land.[3] Plaintiffs contend that at the time of enactment of the JNRAA, plaintiffs had a vested right to receive a patent for the land and that the statutory bar in the JNRAA violated the Fifth Amendment by eliminating that vested right without providing just compensation.

■ It is well established that the right to receive a patent with respect to public lands can vest prior to the issuance of the patent and that where such a right to a patent has "vested," the divestment of that right "is tantamount to divestment of the patent itself, i.e., a divestment of 'property.'" *Freese v. United States*, 226 Ct.Cl. 252, 257, 639 F.2d

754, 758, *cert. denied*, 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 103 (1981) (citing *Benson*, 145 U.S. at 431, 433, 12 S.Ct. at 878, 879). In *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994), the Supreme Court explained: "The Fifth Amendment's Takings Clause prevents the Legislature ... from depriving private persons of vested property rights except for a 'public use' and upon payment of 'just compensation.'" *See also Freese*, 639 F.2d at 758 (denying a Fifth Amendment takings claim on the ground that the right to a patent had not yet vested). Hence, if plaintiffs can demonstrate that they had a vested right to a patent over the land covered in their patent application prior to the enactment of the JNRAA, the enactment of the JNRAA would constitute a divestment of property in violation of the Fifth Amendment's prohibition against the taking of private property without providing just compensation,

Plaintiffs contend that their right to a patent vested when, prior to enactment of the JNRAA, plaintiffs complied with all the requirements for the issuance of a patent, the BLM accepted plaintiffs' payment for a patent, and an authorized BLM officer signed the first half of the final certificate. Defendant responds that as a matter of law, the right to a patent does not vest until the BLM makes a determination that the applicant is entitled to a patent. Defendant argues that plaintiffs had no vested property interest prior to enactment of the JNRAA because the BLM had not performed the mineral examination necessary to verify that plaintiffs had discovered valuable pumice and, hence, had not made the requisite determination that plaintiffs were entitled to a patent.

## V.

The vesting of the right to a patent for public land has been the subject of extensive litigation with frequent consideration by the Supreme Court. *See, e.g., El Paso Brick Co. v. McKnight*, 233 U.S. 250, 257, 34 S.Ct. 498, 501, 58 L.Ed. 943 (1914); *Benson*, 145 U.S. at

3. Section 3(a) of the JNRAA provides that "[n]otwithstanding any other provision of law, no patents shall be issued after May 30, 1991, for any location or claim made in the recreation area under the mining laws of the United States." 16 U.S.C. § 460jjj–2(a)(1).

431–32, 12 S.Ct. at 878–79; *Dahl v. Raunheim,* 132 U.S. 260, 262, 10 S.Ct. 74, 75, 33 L.Ed. 324 (1889). *Benson* involved a predecessor version of the Mining Act which had substantially similar pertinent provisions as the current law. In *Benson,* the locator of a mineral deposit on public lands filed an application for a patent and paid the statutory acreage fee, and the BLM issued a mineral certificate. The BLM, however, did not issue a patent until almost five years later. During the interim, a second person (*i.e.,* a relocator) located minerals on the same land. A dispute arose as to who had superior rights in the land, the relocator or a purchaser of the interest held by the original locator. The relocator contended that his rights were superior and pointed to the statutory requirement that "[o]n each claim ..., and until a patent has been issued therefor, not less than one hundred dollars' worth of labor shall be performed or improvements made during each year, ... and upon a failure to comply with these conditions, the claim ... shall be open to relocation in the same manner as if no location of the same had ever been made.... " *Benson,* 145 U.S. at 429–30, 12 S.Ct. at 878. The purchaser of the interest held by the original locator had failed to make the statutory $100 worth of labor or improvements during a year prior to the issuance of the patent. The relocator argued that under the literal terms of the statute, the obligation to make such an investment lasts "until a patent has been issued" and hence the land was "open to relocation in the same manner as if no location of the same had ever been made."

In refusing to apply the statute in this literal manner, the Supreme Court relied upon the concepts of "equitable title" and of the vesting of a property interest in a patent prior to the actual issuance of the patent. The Court concluded that before the patent actually issued, the original locator had acquired equitable title, or a vested right to receive a patent for the land, and that this equitable title was sufficient to render inapplicable the statutory requirement of a $100 annual investment. *Id.* at 433–34, 12 S.Ct. at 879. In other words, for purposes of interpreting the $100 annual labor requirement of the Mining Act, the Court treated the original locator as though the patent had issued even though legal title had not yet passed. In the course of explaining its conclusion that such a vested right to a patent existed, the Court stated:

> And so we find that section 2325 [of the Mining Act] provides that "a patent for any land claimed and located for valuable deposits may be obtained in the following manner," and gives thereafter the various steps necessary to be taken to purchase the land. Near its close is this, as to the patent: "If no adverse claim shall have been filed with the register and the receiver of the proper land office at the expiration of the sixty days of publication, it shall be assumed that the applicant is entitled to a patent, upon the payment to the proper officer of five dollars per acre, and that no adverse claim exists." In other words, when the price is paid the right to a patent immediately arises. If not issued at once, it is because the magnitude of the business in the Land Department causes delay. But such delay, in the mere administration of affairs, does not diminish the rights flowing from the purchase, or cast any additional burdens on the purchaser, or expose him to the assaults of third parties.

*Id.* at 431–32, 12 S.Ct. at 878.

■ Section 29 of the current Mining Act, in pertinent part, uses essentially the same statutory wording and likewise creates an assumption of entitlement to a patent if no adverse claim is filed. *See supra* p. 437. Under *Benson,* because no adverse claim was filed herein and because plaintiffs paid the statutory purchase price for a patent, an assumption of entitlement to a patent arises. Hence, plaintiffs possessed a vested right to receive a patent covering the land listed in their patent application for which plaintiffs satisfied the statutory and regulatory requirements for the issuance of a patent. With respect to such land, had the BLM conducted a mineral examination before the enactment of the JNRAA, the BLM would have verified plaintiffs' discovery of a valuable mineral deposit and would have been obligated to issue a patent. As in *Benson,* the BLM's delay in issuing a patent would have been the product of "the magnitude of

the business in the [BLM]" and such delay "does not diminish the rights flowing from the purchase, or cast any additional burdens on the purchaser." *Id.* at 432, 12 S.Ct. at 878.

## VI.

Defendant argues that *Benson* should not be so interpreted. Defendant does not base its argument on any subsequent change in the applicable statutes, but rather on changes in the BLM's practice since *Benson.* Defendant asserts that a vested property interest accrues only upon a final determination by the BLM that an applicant has complied with all of the requirements for the issuance of a patent. Defendant then argues that unlike in the instant action, in *Benson* the BLM had made such a final determination when it signed the final mineral certificate. Defendant's argument that the BLM made such a determination in *Benson* proceeds as follows. Defendant alleges that at the time of *Benson,* the BLM used a single-part mineral certificate, rather than the two-part certificate now used. That single-part certificate was issued by the local land office. Because at that time the BLM generally did not conduct its own mineral examinations prior to issuing a patent, the only action required for the issuance of a patent after the local land office issued the certificate was a perfunctory review of the patent application by the Commissioner of the General Land Office. Hence, according to defendant, the issuance of a mineral certificate by the local land office amounted to a final determination by the BLM that the applicant was entitled to a patent. Defendant argues that no similar final determination by the BLM occurred here because only the first half of the two-part mineral certificate was signed and that first half stated that a patent "may" issue, rather than "shall" issue, subject to "demonstration and verification of a valid discovery of a valuable mineral deposit." Defendant's argument, however, has a series of flaws.

## A.

First, defendant's proposed interpretation of the first half of the two-part mineral cer-

tificate is inconsistent with the BLM's own interpretation of that form as evidenced in the BLM Manual. Section 3860 of the BLM Manual, entitled "Mineral Patent Application Processing," describes the BLM's policies concerning the grant of patents and provides:

> The date of issuance (date of entry) of the first half of the final certificate must be the date of the acceptance of the purchase price. This is because the date of acceptance of the purchase price . . . is the legal date of vesting of equitable title (a protected property right) in the applicant, and the final certificate is actually effective on that date.

BLM Manual § 3860. In describing the processing of patent applications, the BLM Manual reiterates that the issuance of the first half of the final certificate "[c]onfirms equitable title is vested in the applicant, subject to the confirmation of a discovery of a valuable mineral deposit by a mineral examiner." BLM Manual § 3860–1. *See also* BLM Manual § 3860 Glossary F (*"final certificate:* . . . Issuance of the first half of the final certificate grants equitable title to the applicant, relieves the applicant of the requirement to perform assessment work, and segregates the land from all forms of entry and appropriation under the public land and mineral laws."). Hence, defendant's proposed interpretation of the effect of the signing of the first half of the certificate is inconsistent with the apparent intent of the agency that designed and employed the certificate.

## B.

Next, defendant's argument that equitable title did not pass to plaintiffs makes too much of the difference between the wording used in the one-part certificate apparently in effect at the time of *Benson* and the wording used in the first half of the two-part certificate used herein. Defendant searched its archives and found a number of different versions of the mineral certificates the BLM has used over the years, with the earliest version dating back to 1915, 24 years after the *Benson* decision. It appears that until 1958, the BLM used a single-part certificate and thereafter changed to a two-part certificate. The language used in the single-part certificate changed between 1915 and 1958,

as has the language used after 1958 in the two-part certificate. Contrary to defendant's suggestion, the issuance of the single-part certificate cannot be characterized as a final determination by the BLM that a patent should issue.

The 1915 version of the mineral certificate, which is the closest in time to the certificate used in *Benson*, states:

> NOW, THEREFORE, Be it known that upon the presentation of this Certificate to the COMMISSIONER OF THE GENERAL LAND OFFICE, together with the plat and field notes of survey of said claim and the proofs required by law, a PATENT shall issue thereupon to the said___

if all then be found regular.

In *Cornelius v. Kessel*, 128 U.S. 456, 9 S.Ct. 122, 32 L.Ed. 482 (1888), the Supreme Court explained that the general supervisory power of the Commissioner of the General Land Office "authorizes him to correct and annul entries of land allowed ... where the lands are not subject to entry, or the parties do not possess the qualifications required, or have previously entered all that the law permits. The exercise of this power is necessary to the due administration of the land department." *Id.* at 461, 9 S.Ct. at 124. Consistent with this broad power, the reservation that the Commissioner shall. issue a patent "if all then be found regular" preserves the Commissioner's authority, after the local land office has acted, to make an independent determination as to whether the applicant has satisfied the statutory and regulatory requirements for a patent. If any requirement is not satisfied, then it would follow that the issuance of a patent would not be "regular." Therefore, it would be fully consistent with the wording of the certificate used in *Benson*, assuming it was analogous to the 1915 version, for the Commissioner to refuse to grant a patent after the issuance of the certificate

if, for example, the Commissioner later determined that "all [was not] found regular" because the applicant had failed to comply with any of the statutory or regulatory requirements, including the discovery of a valuable mineral deposit on the land.

Thus, it is not significant that the BLM changed from a single-part to a two-part certificate and expanded the phrase in the one-part certificate "if all then be found regular" to include "and upon demonstration and verification of a valid discovery" in the first half of the two-part certificate. The reference to "demonstration and verification of a valid discovery" adds detail and clarity in that it explains to the applicant that the BLM has not yet made a determination as to whether the applicant has discovered valuable mineral resources. The legal effect of an authorized BLM officer signing the first half of the current two-part certificate and the prior single-part certificate, in relevant part, is the same in that each certificate allows the BLM subsequently to conduct a mineral examination and neither represents a commitment by the BLM that it will issue a patent without undertaking such an examination. Stated another way, the first half of the two-part certificate, in pertinent part, corresponds to the entire single-part certificate in that it provides that the issuance of a patent is subject to "all [being] found regular." The second half of the two-part certificate contains no such reservation and thereby suggests that all that remains is the mere processing of paperwork.

■ It also is not significant that the first half of the two-part certificate provides that a patent "may issue" if all is found regular instead of "shall issue" as provided in the single-part certificate and earlier versions of the two-part certificate.[4] The use of the word "may" cannot render the BLM's grant of a patent discretionary. Section 22 of the Mining Act states that lands belonging to the

---

4. The first half of the earliest version of the two-part certificate, effective December 1958, provided:

> NOW, THEREFORE, Be it known that upon the presentation of this Certificate to the DIRECTOR OF THE BUREAU OF LAND MANAGEMENT, together with the plat and field notes of survey of said claim and the proofs required by law, a PATENT shall issue thereupon to the said

> if all then be found regular, pending verification of a valid discovery of a valuable mineral as prescribed by the United States mining laws, by an authorized representative of the Government.

United States containing valuable mineral deposits "shall be ... open to ... purchase" under regulations prescribed by law. 30 U.S.C. § 22. The statutes and regulations establish the terms and conditions for the purchase of such land and do not leave the BLM with the option to withhold a patent in the event an applicant satisfies all of the terms and conditions. *See Wilbur v. Krushnic,* 280 U.S. 306, 318–19, 50 S.Ct. 103, 105, 74 L.Ed. 445 (1930). Hence, the difference between the wording used in the mineral certificate that may have issued in *Benson* and the wording used in the first half of the two-part certificate used herein is not sufficient to warrant a conclusion that equitable title passed in *Benson* but not here.

## C.

■ Finally, and most fundamentally, defendant's argument misses the essential rationale underlying the concepts of equitable title and vested property interests as articulated in *Benson.* Under *Benson,* equitable title does not flow from the government completing its review of the application for a patent but rather from the applicant completing the actions required of it for the issuance of a patent. The *Benson* Court explained that "a party who has complied with all the terms and conditions which entitle him to a patent for a particular tract of public land, acquires a vested interest therein, and is to be regarded as the equitable owner thereof.'" 145 U.S. at 433, 12 S.Ct. at 879 (quoting *Wirth v. Branson,* 98 U.S. 118, 25 L.Ed. 86 (1878)). In evaluating the terms and conditions of entitlement, the *Benson* Court gave special focus to the requirement that the applicant pay the statutory per-acre fee for the land. The Court stressed that the acceptance of payment for the purchase of real estate traditionally has been viewed as sufficient to create equitable title. The Court explained:

It is a general rule, in respect to the sales of real estate, that when a purchaser has paid the full purchase price his equitable rights are complete, and there is nothing left in the vendor but the naked legal title, which he holds in trust for the purchaser. And this general rule of real estate law has been repeatedly applied by this court to

the administration of the affairs of the Land Department of the government; and the ruling has been uniform, that whenever, in cash sales, the price has been paid, or, in other cases, all the conditions of entry performed, the full equitable title has passed, and only the naked legal title remains in the government in trust for the other party, in whom are vested all the rights and obligations of ownership.

145 U.S. at 432, 12 S.Ct. at 879. Hence, *Benson* stands for the proposition that the applicant acquires equitable title upon complying with all of the terms and conditions required for entitlement to a patent, including the payment of the statutory fees.

Defendant cites *Swanson v. Babbitt,* 3 F.3d 1348 (9th Cir.1993), to support a contrary interpretation of *Benson.* In *Swanson,* the BLM responded to a patent application by lodging complaints contesting the underlying mining claims. After the BLM filed the complaints, Congress enacted the Sawtooth National Recreation Area Act which, like the JNRAA, prohibited the BLM from granting any new patents on public land located within the area covered by the statute. The plaintiff in *Swanson,* whose mining claims were located within that area, brought suit and alleged, *inter alia,* that the Sawtooth National Recreation Area Act constituted a Fifth Amendment taking. In rejecting the takings claim, the Court of Appeals for the Ninth Circuit purported to apply *Benson* as follows:

Because the delay in the issuance of Swanson's patent application was not attributable to the Department's purely ministerial and administrative functions but resulted from the Department's challenge of the size of Swanson's mill site requests, whatever patent rights Swanson might have possessed did not vest until the resolution of those claims in 1986.

*Id.* at 1354.

*Swanson* differs from the instant case in that prior to the adoption of the JNRAA, the BLM never contested plaintiffs' right to a patent. Indeed, to date, for at least certain of the mining claims covered in plaintiffs' patent application, defendant has never dis-

puted that plaintiffs complied with all pertinent requirements and would have received a patent had the BLM proceeded expeditiously with its mineral examination. Hence, unlike *Swanson,* at least for those claims with respect to which plaintiffs have satisfied all the requirements for a patent, the initial delay in issuing the patent was the result of the BLM's delay in verifying the information plaintiffs provided in their application rather than the BLM challenging plaintiffs' entitlement to a patent.

Recently, in *Independence Mining Co. v. Babbitt,* 105 F.3d 502 (9th Cir.1997), the Ninth Circuit extended *Swanson* to situations where the BLM has not yet determined whether to issue a patent. The court concluded that "no rights can vest before the [BLM] has decided whether to contest the patent claim." *Id.* at 508. The court distinguished *Benson* as follows:

> [In Swanson,] we determined that Benson held the right to a patent arises only after the party seeking the patent has complied with all the terms and conditions entitling it to that patent. Because validity was one of those "terms and conditions," Benson did not alter our ultimate conclusion in Swanson.

*Id.*

This court agrees with the Ninth Circuit that the existence of a valid claim to a patent is a term or condition with which the applicant must comply for equitable title to pass. This court, however, respectfully disagrees with the Ninth Circuit as to precisely at what point in time a valid claim exists. Under the statutory scheme, the discovery of a valid valuable mineral deposit certainly is a "term and condition" with which an applicant must comply to receive a patent. But whether or not the land covered in a patent application contains a valid valuable mineral deposit is an objective fact—either the land contains such a deposit or it does not. Hence, at the time an applicant files an application and describes the land for which it seeks a patent, the applicant either has or has not satisfied the term and condition that the land contain a valid valuable mineral deposit. A mineral examination by the BLM does not alter the existence or nonexistence

of a valid mineral deposit but instead merely enables the BLM to confirm or dispute that the applicant has made such a discovery. Therefore, to the extent that a mineral examination confirms the applicant's claim that the land contains the requisite valuable mineral deposit, it necessarily follows that at the time the applicant filed the patent application, it had complied with one of the pertinent terms and conditions in that it had discovered a valid valuable mineral deposit on public land.

Thus, there is a critical distinction between the discovery by the applicant of a valid valuable mineral deposit, which is a term and condition with which the applicant must comply, and the BLM's verification of that discovery, which is not a prerequisite to the passage of equitable title because it involves the BLM's administration of its own affairs and is not a provision with which the applicant can comply. Stated in another way, the Ninth Circuit is correct in stating that the crucial question under *Benson* is whether "the party seeking the patent has complied with all the terms and conditions entitling it to [a] patent." *Id.* To answer this question, however, the focus must be on the actions of the party seeking the patent, not on the actions of the BLM.

*Cameron v. United States,* 252 U.S. 450, 40 S.Ct. 410, 64 L.Ed. 659 (1920), demonstrates this critical point that the passing of equitable title is not coincident in time with the BLM making a final determination that a claim to a patent is valid. In *Cameron,* the Supreme Court noted that under applicable case law, after the applicant submitted its application for a patent, paid the statutory purchase price, and received the then-applicable, one-part mineral certificate, "[t]he government [held] the legal title in trust for [the applicant], and he may not be dispossessed of his equitable rights without due process of law." *Id.* at 460–61, 40 S.Ct. at 412. The Court went on to explain that notwithstanding this prior creation of equitable rights, until the patent issues and legal title passes, the BLM can assess the validity of the patent grant and refuse to grant a patent if the requirements for a patent have not been satisfied. The Court explained:

[The BLM] has jurisdiction, however, after proper notice to the party claiming such equitable tile, and upon a hearing, to determine the question whether or not such title has passed. In other words, the power of the [BLM] to inquire into the extent and validity of the rights claimed against the Government does not cease until the legal title has passed.

*Id.* at 461, 40 S.Ct. at 412–13 (citations omitted). Hence, under *Cameron,* a BLM determination as to the validity of the grant of a patent is not a prerequisite to the passage of equitable title but rather merely confirms whether or not equitable title previously passed. Herein, because determinations as to validity can be conducted after equitable title passes, the BLM's statement in the first half of the two-part mineral certificate to the effect that the grant of a patent is subject to the results of a BLM mineral examination is not inconsistent with equitable titlee having previously passed to plaintiffs.

*Payne v. State of New Mexico,* 255 U.S. 367, 41 S.Ct. 333, 65 L.Ed. 680 (1921), involved entitlement to rights in public land under a different statute than here involved, but the Supreme Court's analysis therein is instructive on the issue of precisely when equitable title passes. In *Payne,* Congress granted New Mexico public land for the support of common schools. The statute allowed the state to waive its right to receive the identified land and to select in its place other land of equal acreage, referred to as lieu lands, if the identified land was included in a public reservation. The statute further provided that such selection of lieu lands was to be "under the direction and subject to the approval of the Secretary of Interior." Consistent with the statutory requirements, New Mexico executed a waiver of certain lands granted to it under the statute, selected instead certain lieu lands, and filed the required supporting papers with the Department of the Interior (DOI). After no third party protested, the local land office forwarded the supporting papers to the General Land Office for the Secretary's approval. Before the Secretary of the Interior approved the selection of the lieu lands, the original land granted to New Mexico in the statute and to which New Mexico had waived

its rights in favor of the lieu lands was eliminated from the public reservation by a change of boundaries. Hence, there was no longer any valid original land grant that could be replaced by lieu lands. This change of boundaries led to litigation concerning New Mexico's rights in the lieu lands. New Mexico contended that its rights in the lieu lands vested when it made its selection and presented the required papers to the DOI, even though the Secretary had not yet approved the selection as required by the controlling statute.

The parallel between *Payne* and the instant action is apparent. In each case, the applicant sought title to public land and purported to comply with all pertinent terms and conditions, including the submission of an application to the DOI, but the DOI did not approve the grant of title based on events that occurred subsequent to submission of the application. In each case, the applicant brought suit and contended that the government's final approval of the application was not a prerequisite to the vesting of a property right in the land and instead that the applicant's interest in the property vested when, prior to the occurrence of the subsequent events, the applicant complied with all terms and conditions required for the grant of title.

In *Payne,* the Supreme Court, relying on the doctrine of equitable title, agreed with New Mexico that the Secretary's approval was not a prerequisite to New Mexico gaining vested rights. The Court explained:

[It is] well settled that a claimant to public land who has done all that is required under the law to perfect his claim acquires rights against the Government and that his right to a legal title is to be determined as of that time; and also that this rule is based upon the theory that by virtue of his compliance with the requirements he has an equitable title to the land; that in equity it is his and the Government holds it in trust for him.

*Id.* at 371, 41 S.Ct. at 334 (internal quotations omitted). Hence, although approval by the Secretary was required for legal title to pass, such approval was not a prerequisite to New

Mexico perfecting its claim and securing equitable title. The Court explicitly rejected the government's argument that equitable title can pass only when the Secretary of the Interior approves the application as consistent with statutory requirements and instead described the Secretary's approval as an action that is "judicial in nature" and which serves only to confirm whether the acts previously taken by the applicant were sufficient to create a valid claim.[5]

The analysis in *Payne* applies directly when interpreting the Mining Act. As in *Payne,* equitable title passes herein "by virtue of [plaintiffs'] compliance with the requirements," and not by virtue of the Secretary's verification that plaintiffs had complied with those requirements. Also, as in *Payne,* a verification by the Secretary that plaintiffs had satisfied the statutory requirement of discovering a valuable mineral deposit is a determination that is "judicial in nature" which assesses whether plaintiffs previously had satisfied the terms and conditions for the grant of title.

Also instructive is the Court's view of the statutory scheme in *Payne* as creating what amounts to the ground rules governing the DOI's extension of an offer and the public's acceptance of that offer. The Court explained:

> The provision under which the selection was made was one inviting and proposing an exchange of lands. By it Congress said in substance to the State: If you will waive or surrender your titled tract in the reservation, you may select and take in lieu of it a tract of like area from the unappropriated nonmineral public lands outside the reservation. Acceptance of such a proposal and compliance with its terms confer a vested right in the selected land which the land officers cannot lawfully cancel or disregard. In this respect the provision under which the State proceeded does not differ from other land laws which offer a conveyance of the title to those who accept and fully comply with their terms.

*Id,* at 370, 41 S.Ct. at 334. This same reasoning applies herein. Section 22 of the Mining Act offers citizens the right to secure title to federal lands if they comply with the terms and conditions in the controlling regulations. These conditions include the discovery and location of a valuable mineral deposit and the filing of an application that includes extensive information that often is costly to accumulate. Plaintiffs accepted that offer to the extent they incurred the requisite costs and complied with all terms and conditions for the grant of a patent, including payment of the purchase price. Under the reasoning of *Payne,* such an acceptance brings with it equitable title to the land.

Such a focus on an offer and acceptance is not to say that the relationships between the federal government and New Mexico in *Pane,* and between the federal government and plaintiffs herein are governed by the law of contracts. They are not. These relationships are defined instead by the controlling statutes and regulations. Moreover, this court recognizes that as a general matter, citizens do not have a vested property interest in the government maintaining a particular statute or regulatory scheme. *See, e.g., United States v. Locke,* 471 U.S. 84, 104, 105 S.Ct. 1785, 1797–98, 85 L.Ed.2d 64 (1985); *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 16, 96 S.Ct. 2882, 2892–93, 49 L.Ed.2d 752 (1976); *United States v. Jim,* 409 U.S. 80, 82–83, 93 S.Ct. 261, 262–63, 34 L.Ed.2d 282 (1972); *Grand Trunk Western Railway Co. v. City of South Bend,* 227 U.S. 544, 553, 33 S.Ct. 303, 305–06, 57 L.Ed. 633 (1913). But the existence of a property interest in *Payne, Benson,* and the instant case is not based on the mere expectation that the law will remain unchanged. Rather, the existence of a property interest is based on the

---

**5.** The Court explained:

> The words [requiring approval by the Secretary] are not peculiar to this land grant, but are found in many others. Their purpose is to cast upon the Secretary the duty of ascertaining whether the selector is acting within the law, in respect of both the land relinquished and the land selected, and of approving or rejecting the selection accordingly. The power conferred is judicial in its nature and not only involves the authority but implies the duty to determine the lawfulness of the selections as of the time when the exertion of the authority was invoked by the lawful filing of the list of selections.

> *Id.* (internal quotations omitted).

applicant, prior to any change in the law, having done all that is required of it under existing law to receive title to public land, including the filing of all papers and, where applicable, the payment to the United States of the purchase price for a patent. Once the applicant has complied with all requirements, the DOI is obligated under the law to complete the administration of its internal affairs and grant a patent. In other words, plaintiffs had an entitlement to a patent. Interpreting this entitlement to constitute a vested property interest constitutes a reasonable and appropriate application of the doctrine of equitable title and is demanded by the logic that underlies the Supreme Court precedent discussed above.

## VII.

Defendant contends that even if plaintiffs had "some sort of" vested property interest under *Benson*, the court nevertheless should conclude that no Fifth Amendment taking occurred because plaintiffs never had any reasonable investment-backed expectation that they could use the property for nonmining purposes. The concept of reasonable investment-backed expectations has been employed by courts as one factor in a multifactor analysis to determine whether government regulation constitutes a taking of private property. *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1177 (Fed.Cir. 1994). It is not apparent that this action should be analyzed under the multi-factor analysis for a regulatory taking because, as described above, the Supreme Court has determined that a right to receive a patent constitutes a vested property interest and in *Landgraf*, 511 U.S. at 266, 114 S.Ct. at 1497, stated without exception that "[t]he Fifth Amendment's Taking Clause prevents the Legislature ... from depriving private persons of vested property rights except for a 'public use' and upon payment of 'just compensation.'" In any event, even if this court were to focus on reasonable investment-backed expectations, this focus would not aid defendant.

For all of the reasons explained above, assuming plaintiffs made the necessary monetary investment and otherwise complied with all of the statutory and regulatory requirements for the grant of a patent, plaintiffs had a reasonable expectation that they would receive a patent. In turn, if plaintiffs received a patent, and hence title in fee to the land, then plaintiffs reasonably could expect that they would secure the economic benefits that flow from title, including the ability to perform the commercial activities that the owner of a patent on the land could lawfully perform. To the extent there were some legal restrictions on the commercial activities the holder of title could perform, these restrictions certainly would affect the total value of the property taken through enactment of the JNRAA. But defendant has not presented any evidence to suggest that had plaintiffs received a patent, they would have been precluded from all valuable commercialization of the land or that the patent otherwise had no value above that of a mining claim.[6] In any event, the proper time to evaluate the extent to which plaintiffs were damaged by a taking of a vested property interest is during the damage phase of the investigation, and the court will delay its analysis of the economic loss suffered by plaintiffs until that time.

## VIII.

Summary judgment is warranted where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). As explained above, the court interprets the Constitution and the controlling statute to provide that to the extent plaintiffs "complied with all terms and conditions which entitle [them] to a patent," *Benson*, 145 U.S. at 433, 12 S.Ct. at 879, plaintiffs had a vested property interest and the JNRAA could not, consistent with the Fifth Amendment, eliminate that vested property interest without providing just compensation. Defendant's motion

---

**6.** The grant of a patent would at least eliminate the requirement for $100 worth of labor or im-

provements each year.

for summary judgment rests on a contrary interpretation of the law and hence must be denied.

■ As to plaintiffs' motion, for most of the land covered in plaintiffs' application for a patent, defendant has presented evidence supporting the conclusion that the mineral deposits on the land did not qualify as a "valuable mineral deposit." This evidence is sufficient to preclude summary judgment because it demonstrates a dispute as to a material issue of fact, *ie.,* plaintiffs' compliance with "all terms and conditions" for the issuance of a patent. Therefore, plaintiffs' motion for partial summary judgment as it relates to this land is denied. As to the remaining land covered in plaintiffs' patent application, for the reasons explained during oral argument on the parties' cross-motions, the court will grant defendant an opportunity to present evidence demonstrating that plaintiffs failed in other ways to comply with "*all terms and conditions which entitle* [them] to a patent." On or before April 10, 1997, defendant shall file a supplemental brief. On or before April 24, 1997, plaintiffs shall file any response.

IT IS SO ORDERED.