**Richard P. COOK, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 94–344L.

United States Court of Federal Claims.

Jan. 27, 1999.

Sarah M. Singleton, Santa Fe, New Mexico, for plaintiffs. Galen M. Buller and R. Bruce Frederick, of counsel.

Michael Martin, Washington, D.C., for defendant.

**OPINION**

BRUGGINK, Judge.

This action, brought pursuant to the Tucker Act, 28 U.S.C. § 1491 (1994 & Supp. II 1996), asserts an uncompensated taking pursuant to the Fifth Amendment to the Constitution. Plaintiffs contend that the enactment of the Jemez National Recreational Area Act ("JNRAA"), 16 U.S.C. § 460jjj (1994), which prohibits the Bureau of Land Management ("BLM") from granting any new patents on public lands located within the Jemez National Recreational Area in Sandoval, New Mexico, constitutes a taking of their property. The matter is presently before the court on the plaintiffs' motion for partial summary

---

judgment with respect to Brown Placer Mining Claims numbers nine through twelve ("Claims nine through twelve"). Oral argument was held on January 12, 1999, in Washington, D.C. For reasons set forth herein, plaintiffs' motion is granted.

## BACKGROUND

The case was transferred to this judge on December 10, 1998. The background facts are discussed in *Cook v. United States*, 37 Fed.Cl. 435, 436–38 (1997), and are briefly summarized and supplemented here. Pursuant to the Mining Act of 1872 ("Mining Act"), 30 U.S.C. §§ 22–24, 26–30, 33–35, 37, 39–42, 47 (1994), plaintiffs filed a patent application for twenty-three placer mining claims (the "Brown Placer Mining Claims") on September 29, 1989, after locating pumice on lands located within the Jemez National Recreational Area. Plaintiffs published notice of their application, and no adverse claims were filed within sixty days after publication. On January 16, 1991, after accepting plaintiffs' payment of the statutory purchase price for a patent, BLM issued the first half of BLM Form 1860–1, the two-part final certificate, to plaintiffs.

On October 12, 1993, Congress enacted the JNRAA which bars BLM from issuing any new patents on land within the Jemez National Recreational Area after May 30, 1991. *See* 16 U.S.C. § 460jjj–2(a)(1). During the period between BLM's issuance of the first half of the final certificate and Congress' enactment of the JNRAA, BLM did not perform a mineral examination to verify that plaintiffs had discovered valuable mineral deposits on the land described in their patent application.

Plaintiffs filed the instant action alleging that the enactment of the JNRAA constituted a taking of vested property interests in the mining patent without just compensation. They have moved for partial summary judgment on the issue of liability, claiming that they acquired equitable title to a mining patent when they complied with all statutory

and regulatory requirements and received a final certificate. Defendant filed a cross-motion for summary judgment and a motion to dismiss for failure to state a claim, asserting that plaintiffs had no constitutionally protected right to a patent because BLM had not yet determined the validity of plaintiffs' claims.

The court earlier denied defendant's summary judgment motion, holding that "to the extent plaintiffs 'complied with all terms and conditions which entitle [them] to a patent[,]' [*Benson Mining & Smelting Co. v. Alta Mining & Smelting Co.*, 145 U.S. 428, 433, 12 S.Ct. 877, 36 L.Ed. 762 (1892) ], plaintiffs had a vested property interest and the JNRAA could not, consistent with the Fifth Amendment, eliminate that vested property interest without providing just compensation." *Cook*, 37 Fed.Cl. at 446–47. Included in the terms and conditions with which applicants had to comply was the discovery of a valuable mineral deposit. *See* 30 U.S.C. §§ 22 and 29. A mineral examination enables BLM to confirm or dispute allegations in a patent application that the claims contain a valuable mineral deposit. On April 20, 1995, prior to ruling on the parties' cross-motions, the court suspended proceedings pending defendant's completion of a mineral examination.[1] Defendant's final report on the mineral examination, filed on October 15, 1996, indicates that there was locatable pumice on Claims nine through twelve and that elements of a contest were present with respect to the remaining nineteen claims. Because this evidence disputing the existence of valuable mineral deposits on nineteen of plaintiffs' claims demonstrated a dispute as to a material issue of fact, the court denied plaintiffs' motion for partial summary judgment with respect to those nineteen claims.

As to Claims nine through twelve, however, the court granted defendant "an opportunity to present evidence demonstrating that plaintiffs failed in other ways to comply with 'all terms and conditions which entitle [them] to a patent.'" *Cook*, 37 Fed.Cl. at 447. In

---

1. The JNRAA requires the Secretary of Agriculture to conduct mineral examinations of all unpatented mining claims within the Jemez National Recreational Area, including those for which a patent application had been filed, within three years of October 12, 1993. *See* 16 U.S.C. § 460jjj–2(d).

response to this opportunity, defendant now contends that plaintiffs' use of the phrase "block pumice" in their patent application limits them to claiming block pumice of over two inches under the Multiple Use Mining Act of 1955 ("Multiple Use Act"), 30 U.S.C. §§ 601, 603, 611, 615 (1994). Because their application did not claim that the pumice was over two inches, defendant argues, plaintiffs did not properly describe a locatable mineral in their patent application.

## DISCUSSION

■ Defendant argues that plaintiffs do not have a vested right in a mining patent on Claims nine through twelve because they had not fully complied with the patent application requirements of the Mining Act prior to October 12, 1993, the date that Congress enacted the JNRAA. Specifically, it contends that plaintiffs failed to describe a locatable mineral deposit in their application. Defendant asserts that because plaintiffs described their mineral deposit as "block pumice," they were limited to claiming the block pumice exclusion under the Multiple Use Act. Thus, plaintiffs' description of and data on the mineral deposits in Claims nine through twelve would not, even if verified, support the discovery of pumice having one dimension of two inches or more. As the following discussion demonstrates, however, defendant's argument is unavailing.

The Multiple Use Act identifies the types of pumice that are locatable under the Mining Act. It states: "No deposit of common varieties of sand, stone, gravel, pumice, pumicite, or cinders ... shall be deemed a valuable mineral deposit within the meaning of the mining laws of the United States so as to give effective validity to any mining claim hereafter located under such mining laws...." 30 U.S.C. § 611 (1994) (hereafter, "section 611"). The act, however, specifically excludes certain distinct minerals from the scope of common variety minerals:

> "Common varieties" as used in this subchapter and sections 601 and 603 of this title does not include deposits of such materials which are valuable because the deposit has some property giving it distinct and special value and does not include so-

called "block pumice" which occurs in nature in pieces having one dimension of two inches or more.

*Id.* In other words, although pumice is presumptively a common variety mineral, and thus non-locatable, under two distinct circumstances it qualifies as a locatable mineral: (1) if it has some property giving it distinct and special value, or, (2) if it is block pumice having one dimension of two inches or more.

There is no question that the mineral examination on these four claims revealed the presence of pumice in the first category, i.e., pumice having some property giving it distinct and special value. Defendant argues, however, that because plaintiffs' application included a reference to the minerals on their claims as "block pumice," plaintiffs were limited to the block pumice exclusion under section 611 of the Multiple Use Act. Because, furthermore, the application describes some of the pumice as "3/4″ in diameter[,]" it is asserted to be defective on its face, irrespective of whether either block pumice of two inches or more or pumice having distinct and special value exists on the claims. Defendant bases its argument on the premise that section 611 limits block pumice exclusively to pumice having one dimension of two inches or more. Thus, defendant contends that by including the word "block" in the description of their mineral deposit, plaintiffs defacto described their mineral deposit as block pumice having one dimension of two inches or more.

Defendant relies on *United States v. Multiple Use*, 120 IBLA 63 (1991). Multiple Use filed a patent application describing the valuable mineral that it found on its claims as pumice. *See id.* at 74. The Forest Service issued a mining claim contest complaint alleging that Multiple Use's claims were invalid because they were located for a mineral designated as "common variety" under section 611. *See id.* at 75, 81. During the hearing, Multiple Use asserted that its claims contained both block pumice having one dimension of two inches or more and pumice that is otherwise considered uncommon. *See id.* at 84. The Interior Board of Land Appeals ("IBLA") concluded that only 0.72 percent to 1 percent of the pumice on Multiple Use's

claims qualified for exclusion under section 611 as block pumice having one dimension of two inches or more. *See id.*

In a footnote, the IBLA stated: "[t]hroughout the hearing witnesses for Multiple Use referred to any pumice having a dimension in excess of one inch as block pumice. The Common Varieties Act, 30 U.S.C. § 611 (1988), clearly states that block pumice must have one dimension of 2 inches or more." *Id.* at 84. This footnote merely explains why testimony which described the minerals found on Multiple Use's claims as block pumice having one dimension of one inch or more cannot be used to counter the assumption that pumice is a common variety mineral. In no way, however, does the decision limit the use of the phrase "block pumice" by patent applicants. In fact, the IBLA concluded that the other 99 percent of the pumice was open for consideration as uncommon variety pumice, *see id.* at 84–85, despite the fact that Multiple Use may have referred to portions of that 99 percent as block pumice.

Nothing in the Multiple Use Act or the Mining Act defines the phrase "block pumice" or limits its use in patent applications to pumice having one dimension of two inches or more. Section 611 merely excludes a subset of block pumice—that having one dimension of two inches or more—from consideration as common variety pumice. Moreover, as plaintiffs have demonstrated, the word "block" is used by geologists to describe fragments of rock ranging in size from 4 millimeters to 256 millimeters (approximately .16 inch to 10.1 inches). *See Glossary of Geology and Related Sciences* at 33 (American Geological Institute, 2d ed.1960). Hence, plaintiffs' use of the phrase "block pumice" to describe fragments of pumice having one dimension of three-quarters of an inch does not limit plaintiffs to the block pumice exclusion under the Multiple Use Act.

■ The second element of defendant's argument—that because plaintiffs based their claims on the discovery of "block pumice" having one dimension of two inches or more, they failed to properly describe a locatable mineral on Claims nine through twelve—thus fails. The fact that plaintiffs' application contains no data, such as grain-size measurements, on Claims nine through twelve which, if verified, would demonstrate the discovery of pumice having one dimension of two inches or more is therefore not fatal, so long as the first exception was properly invoked. It was.

As evidenced throughout their application, plaintiffs based their claims on the discovery of the other type of locatable pumice—pumice having some property giving it distinct and special value. Thus, the pertinent issue is whether plaintiffs' application properly described that type of locatable mineral.

BLM regulations require patent applicants to file a narrative statement describing the mineral found and data supporting the claim, which the Government may use in conducting field examinations to verify the claims:

At the time the proof of posting is filed the claimant must file in duplicate an application for a patent showing that he has the possessory right to the claim, in virtue of a compliance by himself (and by his grantors ...) with the mining rules, regulations, and customs of the mining district or State in which the claim lies, and with the mining laws of Congress, such statement to narrate briefly, but as clearly as possible, the facts constituting such compliance, the origin of his possession, and the basis of his claim to a patent.... The showing in these regards should contain sufficient data to enable representatives of the Government to confirm the same by examination in the field and also enable the Bureau of Land Management to determine whether a valuable deposit of mineral actually exists within the limits of each of the locations embraced in the application.

43 C.F.R. § 3862.1–1(a) (1997). Applications for placer mining claims with mineral deposits other than gold "must describe fully the kind, nature, and extent of the deposit, stating the reasons why the same is ... regarded as a valuable mineral claim." *Id.* § 3863.1–3(a).

Common variety minerals do not qualify as valuable because they "do not possess a distinct, special economic value for such use over and above the normal uses of the general run of such deposits." *Id.* § 3711.1(b).

Uncommon varieties include mineral deposits with "distinct and special properties making [them] commercially valuable for use in a manufacturing, industrial, or processing operation." *Id.* In determining the commercial value of a mineral deposit, BLM considers factors such as the "quality and quantity of the deposit, geographical location, proximity to market or point of utilization, accessibility to transportation, requirements for reasonable reserves consistent with usual industry practices to serve existing or proposed manufacturing, industrial, or processing facilities, and feasible methods for mining and removal of the material." *Id.*

The *American Law of Mining* recites that "[t]he extent of information which must be initially submitted with a patent application is not settled." 2 *American Law of Mining*, § 51.07[8] at 51–49 (2d ed.1996). Patent applications, however, "should contain, in detail, such data as will support the claim that the land applied for is placer ground containing valuable mineral deposits...." 43 C.F.R. § 3863.1–3(a). Section 3863 of the BLM Manual, under the heading "Placer Mining Claim Patent Applications," states that "[t]he information concerning the geology and mineral quantity and quality must be sufficiently detailed for the State Office mineral examiner to determine that the applicant has a reasonable likelihood of success in developing a valuable mine, subject to verification on the ground by the mineral examiner." BLM Manual § 3863.

Plaintiffs' application for Claims nine through twelve properly describes a locatable mineral deposit. It demonstrates that they based their claims on the discovery of unique pumice that is more valuable than ordinary pumice due to its distinct purity, size, and color. For example, in their application plaintiffs state:

> Block pumice was erupted from the El Cajete vent in a series of eruptions, at least 10 or more in number, over a relatively short period of time. Little or no erosion or weathering occurred between eruptions so that the pumice *shows little discoloration, and no deterioration.*
>
> . . . .

The base of the El Cajete pumice deposit is irregular; it is sometimes marked by a thin surge deposit, sometimes by a thin clay-rich layer from a few inches to a few feet thick, and sometimes the block pumice rests directly on the rhyolite with no material in between. The *unique quality of the pumice is evidenced by its remarkable purity;* the average number of lithic fragments is probably less than 20% of the total mass and some exposures contain less that 1% lithic impurities. Because there was little time between eruptive events little or no weathering or erosion took place in the deposit. As soon as the pumice dries out *it is uniformly white and contains almost no staining or discoloration.*

. . . .

*... The "Pumice Grain Size" measurements* shown on the diagrams forming Exhibit "T", attached hereto and incorporated herein by reference *indicate an average block content (blocks greater that 3/4" in diameter) of over 50%, demonstrating the uniqueness of the deposit.* Ordinary pumice generally contains less than 5% block pumice. In additions, *an extraordinarily high percentage of the blocks are actually in excess of 2",* again demonstrating the uniqueness of this deposit.

. . . .

The block pumice is distributed very uniformly throughout the claims and represents over 50% of the material on average and locally is far more abundant (over 90% in some cases). *From a commercial point of view this distribution is extremely valuable and coupled with the purity and lack of discoloration in much of the section enhances the uniqueness of the deposit.*

. . . .

From the processing plant the material is sold FOB to consumers. The principle specifications which must be met by the producer are *uniform white color, strict size limits, and a supply sufficient to meet demand.*

. . . .

*The block pumice discovered by Applicants on each claim is of sufficient quality*

*and quantity to show present marketability at a profit. Block pumice is currently in demand for fabric treatment, landscaping, and manufacturing* purposes. Mining operations conducted by Applicants' lessee at the Los Conchas Mine, which are at a pilot test stage and not yet at full capacity, currently generate royalties to Applicants based on a gross profit in excess of $5,000.00 per week. Full production at Los Conchas Mine alone, which is planned throughout 1990 and beyond pursuant to the schedule set forth in the 1989 Plan of Operations, will generate royalties based upon a gross profit in excess of $29,000.00 per week.

. . . .

*Market demand for block pumice is increasing steadily,* and demand in the United states far exceeds domestic supply. . . . The demand for the pumice in question is particularly high due to its purity and size.

Plaintiffs' Patent Application ("Application") at 23, 24, 28, 31, 34, 37, and 38 (emphasis added). These excerpts demonstrate that plaintiffs intended to base their mining claims on the discovery of a mineral that they call "block pumice" which is "unique" because of its size, purity, and lack of discoloration or staining qualities, and because it is valuable and marketable. This is more than sufficient to claim discovery of a locatable mineral under the Multiple Use Act.

Plaintiffs' application included a forty-page sworn statement which describes the kind, nature, and extent of their mineral discovery, narrates facts relating to the basis for their claim, and includes verifiable data showing the existence of a valuable mineral deposit as required by the BLM's patent application regulations. *See* 43 C.F.R. §§ 3862.1–1(a) and 3863.1–3. It also provides data from which government officials could confirm the location upon field examination. In their application, plaintiffs stated that they "discovered and located a valuable placer mineral deposit of block pumice on each of the Claims." Plaintiffs described the depth and thickness of the El Cajete pumice deposit

and detailed the distinct and valuable properties of the pumice on their claims. They also provided grain-size measurements of the pumice and explained how they arrived at the average block content, describing the samples used and the method of measurement. Plaintiffs stated that "[t]he eight areas utilized [for sampling] are scattered over more than three (3) miles of exposures and provide a representative sample of the deposit as a whole." (Application at 29.)

Plaintiffs referred to Exhibit W of their application, which indicates the mining costs and profits of their pilot test and the estimated costs and profits of future production. Exhibit X contains the sales and production figures for their pilot test, and Exhibit Y describes the domestic use and production of pumice. Plaintiffs compared the sales price of the uncommon variety pumice mined from their claims, which ranged from $5.50 to $28.80 per cubic yard, to the appraisal price for common variety pumice, which was $0.25 per cubic yard, demonstrating the special economic value of their pumice deposits.[2]

Defendant's final argument, drawn from the following *dicta* in *Kitts*, 84 IBLA 338 (1985), is that plaintiffs failed to make a *prima facie* showing of a valuable mineral discovery:

An applicant has an obligation to support his application for mineral patent with sufficient descriptive information and data to permit the BLM mineral examiner, on review in his office, to conclude that each claim was valid and that all prerequisites for patent had been met, subject only to *confirmation* upon field examination. In short, the patent application must make a *prima facie* showing that he is entitled to the patent he seeks. This is a reasonable requirement because, otherwise, BLM would be obliged to waste the valuable time of its mineral examiners to conduct costly field examinations based upon information which did not even show the patent application to be meritorious on its face.

*Id.* at 343.

In *Kitts*, the IBLA affirmed a BLM decision rejecting Kitts' patent application with-

---

2. Exhibit U is a letter from Bob Crostic of the Jemez District Recreation and Lands staff, quoting the appraisal price from common variety pumice as of August 15, 1989. Exhibit W contains the sales prices for pumice mined from the pilot mine on plaintiffs' claims.

out prejudice because he "failed to submit a mineral survey of the unsurveyed land encompassed by his claims ...[,]" and the economic and geologic information was insufficient to support the allegation that he had discovered a valuable mineral. *Id.* at 339. With regard to Kitts' inadequate economic and geologic information, the IBLA stated:

> Specifically, appellant has provided no meaningful description of the geology on the claims *or* in the general area; no substantiated description of the quantity and quality of the ore alleged discovered; no description of the discovery points; no description of the samples taken in terms of their location, size, the sampling technique employed, or the means of their evaluation; no description of the workings presently existing on the respective claims, if any; and no description of the $500 in improvements which allegedly have been installed or constructed for the benefit of each of the claims.

*Id.* at 342. The IBLA also found that the applicant's economic analysis was problematic because he failed to ascribe any cost to labor, used an overstated average price for gold, and based his production estimates on a non-typical and unproven production technique. *See id.* Based on the absence of a mineral survey and the other information described above, the IBLA affirmed BLM's decision rejecting the application. *See id.* at 343.

The instant case is factually distinct. In *Kitts,* the IBLA's description of the deficiencies in Kitts' application reads as a virtual index of the information plaintiffs here submitted with their application. For example, unlike the application in *Kitts,* plaintiffs described the geology of the land encompassing their claims in detail and included a narrative on the origin and geological history of their discovery.[3] Plaintiffs also detailed the quantity and quality of the pumice discovered. They discussed the location, size, and depth of the El Cajete pumice deposit which en-

compasses their claims, as well as the surface exposure of block pumice. Plaintiffs submitted diagrams of the drill hole cuts, including the results of drill hole cuts on Claims nine through eleven, which illustrate the depth of the block pumice deposit on each claim. Also included was a diagram illustrating the outer boundary of their contiguous claims and showing the location of the drill holes and the pumice outcrops. Exhibit S to plaintiffs' application is a diagram of the drill holes and road cuts. Plaintiffs described the method they used for deriving the quantity and size of the pumice and the locations and representative nature of the samples that they used. At least $500 worth of improvements were performed for each claim. Plaintiffs submitted sworn statements from two disinterested witnesses as proof of their expenditures. Finally, plaintiffs detailed the work done on the mine site, the mining operations conducted during the pilot test stage by applicants lessee, including the production and gross profits at the time they submitted their application and estimated future production figures, and the market demand for the type of pumice they discovered. Plaintiffs' application thus did not contain substantive deficiencies, unlike Kitts' application.

The court, in any event, has misgivings about the statement in *Kitts* that applicants must submit data sufficient "to permit the BLM mineral examiner, on review *in his office,* to conclude that each claim was valid and that all prerequisites for patent had been met...." *Kitts,* 84 IBLA at 343 (emphasis added). It is at odds with 43 C.F.R. § 3862.1–1, which states: "The showing ... should contain sufficient data to enable representatives of the Government to confirm the same by examination *in the field.*" *Id.* (emphasis added). In *Brattain Contractors, Inc.,* 37 IBLA 233 (1978), the IBLA interpreted the mining laws as precluding BLM from rejecting a patent application because it fails to include sufficient evidence of discovery. *See id.* at 240 ("[I]t is premature to

---

**3.** Their application explains the origin of the pumice deposit, as follows:

> The massive block pumice deposit underlying Applicants' Claims was erupted as one of the most recent events in the development of the present Jemez Caldera. The pumice is derived

from a small crater called El Cajete in the moat zone of the caldera and ... was deposited in an arcuate pattern covering an area primarily south and west of the crater....
(Application at 21.)

reject the patent application on the adjudicator's finding of insufficient evidence of discovery.").[4] The IBLA stated: "Before there can be any final disposition of a mineral patent application which is otherwise acceptable, there must be a mineral examination of the subject claims for the purpose, inter alia, of obtaining evidence tending either to confirm or refute the allegation that qualifying discoveries have been made." *Id.*[5] In any event, even if this court accepted the more burdensome showing required under *Kitts*, plaintiffs' application includes precisely the type of information that the IBLA required.

There being no other showing by defendant that plaintiffs failed to comply with the terms and conditions entitling them to a patent, and in view of the court's prior decision that compliance with the terms and conditions of a patent gives rise to a vested property right, it is undisputed that the passage of the JNRAA destroyed plaintiffs' property right and did so without compensation. It follows that plaintiffs' motion for summary judgment as to liability must be granted.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for partial summary judgment is granted. On or before February 12, 1999, the parties shall file a joint status report proposing a schedule for resolving the issue of compensation, including proposed dates for discovery cutoff and the filing of pre-trial

materials, as well as the date and location of trial. Trial should conclude no later than October 29, 1999.

---

4. Because BLM rejected Kitts' application for failing to submit a survey and for deficiencies in information and data supporting Kitts' claim, it is unclear whether *Kitts* is at odds with *Brattain.* In *United States Steel Corp.,* 52 IBLA 319 (1981), the IBLA observed that BLM must reject an application which is not accompanied by a mineral survey of any unsurveyed land. *See id.* at 324. One of the primary reasons that BLM rejected Kitts' application was because Kitts failed to submit a mineral survey. *See Kitts,* 84 IBLA at 339. In *United States Steel,* the IBLA stated that BLM could properly reject a patent application in which applicants failed "to comply with a clear requirement of the regulations relating to the form of the application." *Id.* at 324. The IBLA also stated, however, that "it is premature to reject the patent application on the adjudicator's finding of insufficient evidence of discovery." *Id.* at 323. *Kitts* may be read in conformity with *United States Steel* assuming Kitts' application was found to have been so manifestly deficient in information that it repre-

sented a failure "to comply with the clear requirement of the regulations relating to the form of the application...." *Id.* at 324.

5. *Kitts* is also criticized in *American Law of Mining,* which states:

Dennis J. Kitts states in dicta that the information and data must be sufficient to enable a BLM mineral examiner to conclude "on review *in his office* " that a claim is valid and meets the requirement for a patent, apparently including the requirements of a discovery. The opinion goes on to state that a *prima facie* showing is required. It is not clear that these statements are in accord with prior law or with 43 C.F.R. § 3862.1–1. Nor is it clear what a "prima facie showing" means in the context of a patent application because the term generally is used only in relation to evidentiary burdens in adversarial proceedings.

2 *American Law of Mining,* § 51.07[8] at 51–49, n. 126.1 (citations omitted).