FILED
United States Court of Appeals
Tenth Circuit

April 19, 2010

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

COPAR PUMICE CO., INC.,

      Plaintiff-Appellant,

v.

TOM TIDWELL, Chief of the United
States Forest Service; UNITED
STATES FOREST SERVICE;
GILBERT ZEPEDA, Appeal
Reviewing Officer, Deputy Regional
Forester, United States Forest Service;
DANIEL J. JIRON, Forest Supervisor,
United States Forest Service.

      Defendants-Appellees.

No. 07-2211

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 1:06-CV-00097-WJ)**

---

Joseph E. Manges of Comeau, Maldegen, Templeman & Indall, LLP, Santa Fe,
New Mexico, for Plaintiff-Appellant.

Elizabeth Ann Peterson, Attorney, Environment and Natural Resources, United
States Department of Justice, Washington, D.C. (John C. Cruden, Acting
Assistant Attorney General, Environment & Natural Resources Division, United
States Department of Justice, Washington, D.C.; William B. Lazarus, Attorney,
Department of Justice, Washington, D.C.; Patricia Leigh Disert, Of Counsel,
Office of General Counsel, United States Department of Agriculture,
Albuquerque, New Mexico; Andrew R. Varcoe, Of Counsel, Office of the General
Counsel, Litigation Division, United States Department of Agriculture,
Washington, D.C., with her on the brief), for Defendants-Appellees.

Before **HENRY**, Chief Judge, **HOLLOWAY**, and **BRISCOE**, Circuit Judges.

**BRISCOE**, Circuit Judge.

Petitioner-Appellant Copar Pumice Company, Inc. ("Copar"), proceeding under the Administrative Procedure Act, 5 U.S.C. § 500 et seq. ("APA"), appeals the district court's denial of its petition for review concerning the Notice of Noncompliance that the United States Forest Service (FS) issued to Copar concerning its pumice mining activities.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

I

Copar operates the El Cajete pumice mine on four unpatented mining claims located within the Jemez National Recreation Area in New Mexico. Pursuant to a written settlement agreement with the FS, Copar may extract pieces of pumice in excess of 3/4 inches in size ("+3/4" pumice"), "subject to all pertinent statutes and regulations."  Aplt. App. at 74.  Copar's +3/4" pumice is an "uncommon variety" of pumice that has a distinct and special value as a stonewashing agent in the garment finishing industry: the pumice "abrade[s] denim fabric, especially jeans, by creating a worn look on new denim fabric." Aple. Supp. App. at 53.  Copar acknowledged in the settlement agreement that it

2

could not dispose of any common variety pumice produced from these claims.

After El Cajete mining operations began, the FS learned that Copar was not exclusively selling its +3/4" pumice to the garment finishing industry; rather, Copar was selling some of its +3/4" pumice to other industries for common variety uses. The FS claimed that this practice violated the applicable regulations, as well as the settlement agreement. According to the FS's interpretation of its regulations, +3/4" pumice not used in an application that utilized its distinct and special value was nothing more than common variety pumice that Copar could not extract from El Cajete. Copar disagreed, and the FS eventually issued Copar a Notice of Noncompliance.

*Statutory and Regulatory Background*

The "cornerstone of federal legislation dealing with mineral lands" is the General Mining Law of 1872, Act of May 10, 1872, 17 Stat. 91 (1872) (codified as amended at 30 U.S.C. § 22 et seq.). United States v. Coleman, 390 U.S. 599, 600 n.1 (1968). The General Mining Law declared that "all valuable mineral deposits in lands belonging to the United States . . . shall be free and open" to United States citizens, 30 U.S.C. § 22, and allowed citizens "to go onto unappropriated, unreserved public land to prospect for and develop" these mineral deposits, United States v. Locke, 471 U.S. 84, 86 (1985). After discovering a valuable mineral deposit, and complying with minimal procedures to formally locate the deposit, citizens have the right of exclusive possession of the land for

3

mining purposes.  See 30 U.S.C. § 26; Locke, 471 U.S. at 86.  These unpatented

claims are "fully recognized possessory interest[s]."  Locke, 471 U.S. at 86.

Citizens can also patent their claims under the General Mining Law, which allows

them to acquire ultimate title to the land.  30 U.S.C. § 29; Freese v. United States,

639 F.2d 754, 755 (Ct. Cl. 1981).

Two tests have been applied for determining what qualifies as a "valuable

mineral deposit" under the General Mining Law: (1) the "prudent man test," and

(2) the "marketability test."  A mineral deposit is valuable under the "prudent

man test" if the deposit is "of such a character that a person of ordinary prudence

would be justified in the further expenditure of his labor and means, with a

reasonable prospect of success, in developing a valuable mine."  Coleman, 390

U.S. at 602 (quotation and citation omitted).  The "marketability test" is the

"logical complement" to the prudent man test: it requires a mining operator to

show "that the mineral can be extracted, removed and marketed at a profit."  Id. at

600, 602 (quotation omitted).

Because "[c]ertain very common minerals, such as common earth and

common clay, were never disposable under either the mining law or the mineral

leasing acts," Congress enacted the Materials Act of 1947, 61 Stat. 681 (1947)

(codified as amended at 30 U.S.C. § 601 et seq.), to provide a method for their

disposal. 1-4 American Law of Mining § 4.16 (2d ed. 2008).  Congress later

amended the Materials Act when it enacted the Surface Resources Act of 1955

4

(also known as the Common Varieties Act), 69 Stat. 367 (1955) (codified at 30 U.S.C. § 601 et seq.).  Together, these Acts provide that the Secretary of the Interior and the Secretary of Agriculture, "under such rules and regulations as [they] may prescribe, may dispose of mineral materials (including but not limited to common varieties of the following: sand, stone, gravel, pumice, pumicite, cinders, and clay) . . . on public lands of the United States."[1]  30 U.S.C. § 601 (emphasis added).  Generally, the disposal of these mineral materials occurs "by contract let through competitive bidding."  1-7 American Law of Mining §7.03[2].

Crucial to the issues in this case, the Common Varieties Act removed certain "common varieties" of minerals from the General Mining Law's definition of "valuable mineral deposit."

> No deposit of common varieties of sand, stone, gravel, pumice, pumicite, or cinders and no deposit of petrified wood shall be deemed a valuable mineral deposit within the meaning of the mining laws of the United States so as to give effective validity to any mining claim hereafter located under such mining laws . . . .

30 U.S.C. § 611 (emphasis added).  Disposal of these "common varieties" was now "permissible only under the Materials Act of 1947."  Watt v. W. Nuclear, 462 U.S. 36, 57 n.15 (1983).  However, as its title makes clear, the Common

---

[1] The statute authorizes the disposal of mineral materials so long as it "(1) is not otherwise expressly authorized by law, . . . and (2) is not expressly prohibited by the laws of the United States, and (3) would not be detrimental to the public interest."  30 U.S.C. § 601.

5

Varieties Act only removed certain "common varieties" of minerals, such as pumice, from the application of the General Mining Law.

> "Common varieties" as used in this subchapter and sections 601 and 603 of this title <u>does not include deposits of such materials which are valuable because the deposit has some property giving it distinct and special value</u> and does not include so-called "block pumice" which occurs in nature in pieces having one dimension of two inches or more.

30 U.S.C. § 611 (emphasis added). Thus, an ordinarily common variety mineral, such as pumice, would remain locatable under the General Mining Law as an "uncommon variety" if it had "some property giving it distinct and special value."

The Department of Agriculture has promulgated regulations, contained in 36 C.F.R. Part 228, that regulate mining operations conducted on National Forest System lands. Subpart C of these regulations governs the "Disposal of Mineral Materials" (i.e. those minerals that fall within the ambit of the Materials Act and the Common Varieties Act). Subpart C's regulations set forth the procedures for disposing of "mineral materials" on National Forest Service lands. <u>See generally</u> 36 C.F.R. §§ 228.47-.67.

Subpart A of these regulations governs the removal of "Locatable Minerals" (i.e. those minerals subject to location under the General Mining Law, including the "uncommon varieties" of minerals exempt from the Common Varieties Act) from National Forest Service lands. These regulations require that mining operations "shall be conducted so as to minimize adverse environmental impacts on National Forest System surface resources." 36 C.F.R. § 228.1.

6

Mining operators must submit a plan of operations for approval, which must include a description of mining operations, "the period during which the proposed activity will take place," and the environmental protection measures the mining operator will undertake to comply with the regulations. Id. § 228.4(c)(3). "Forest Officers shall periodically inspect operations to determine if the operator is complying with the regulations in this part and an approved plan of operations." Id. § 228.7(a). When a mining operator fails to comply with its plan of operations or with the regulations, and that noncompliance "unnecessarily or unreasonably caus[es] injury, loss or damage to surface resources," the FS "shall serve a notice of noncompliance upon the operator." Id. § 228.7(b).

The controlling regulation in this case is 36 C.F.R. § 228.41, which defines the "Scope" of the Subpart C regulations. This regulation sets forth a system of classification that determines whether a mineral qualifies as a common variety such that it is subject to Subpart C's regulations, or whether a mineral qualifies as an "uncommon variety" such that it is subject to Subpart A's regulations. Subsection (c) of § 228.41 describes the types of minerals considered to be common variety.

> *Mineral materials to which this subpart applies*. This subpart applies to mineral materials which consist of petrified wood and <u>common varieties</u> of sand, gravel, stone, <u>pumice</u>, pumicite, cinders, clay, and other similar materials. Such mineral materials <u>include deposits which, although they have economic value, are used for agriculture, animal husbandry, building, abrasion, construction, landscaping, and similar uses</u>.

7

36 C.F.R. § 228.41(c) (underlining emphasis added).  Subsection (d) describes the types of minerals considered to be "uncommon variety."

> *Minerals not covered by this subpart*. Mineral materials do not include any mineral <u>used</u> in manufacturing, industrial processing, or chemical operations <u>for which no other mineral can be substituted due to unique properties giving the particular mineral a distinct and special value</u>; nor do they include block pumice which in nature occurs in pieces having one dimension of two inches or more which is valuable and used for some application that requires such dimensions. Disposal of minerals not covered by this subpart is subject to the terms of the United States Mining Laws, as amended (30 U.S.C. 22 *et seq.*), on those portions of the National Forest System where those laws apply.

Id. § 228.41(d) (underlining emphasis added).  Subsection (e) indicates that the "use" of a common variety mineral could potentially transform it into a "uncommon variety:" "[a] use which qualifies a mineral as an uncommon variety under paragraph (d) overrides classification of that mineral as a common variety under paragraph (c) of this section."  Id. § 228.41(e)(2).

The central legal question in this case is whether the FS's interpretation of its regulations is arbitrary and capricious.  The FS contends that under § 228.41(c), (d), and (e), Copar's +3/4" pumice is an uncommon variety of pumice only if it is actually used in the garment finishing industry – i.e., an application that utilizes its distinct and special value.  Thus, the FS contends that under its regulations, the *end-use* of the mineral determines whether it is common or uncommon variety.  Copar instead argues that its +3/4" pumice is an uncommon variety simply because it is *suitable for use* in the garment finishing industry.

8

*Procedural Background*

In the late 1980s, Kelly Armstrong, Debbie Cantrup, Richard P. Cook, and Shirley A. Cook (collectively "Cook family") located 23 mining claims within the Santa Fe National Forest. Aple. Supp. App. at 51. The claims were called the Brown Placer Mining Claims; the El Cajete mining operation is situated on the claims numbered 9-12. All claims were leased to Copar, and the Cook family filed a patent application with the Bureau of Land Management ("BLM") in September 1989. Id. On January 16, 1991, the BLM issued a first half final certificate, which is "an administrative recording of an applicant's compliance with the initial paperwork requirement" of the General Mining Law. Independence Mining Co., Inc. v. Babbitt, 105 F.3d 502, 506 (9th Cir. 1997).

The BLM never patented the claims. On October 12, 1993, Congress enacted the Jemez National Recreation Area Act, 16 U.S.C. §§ 460jjj to jjj-5 ("JNRAA"), which designated approximately 57,000 acres of the Santa Fe National Forest as the Jemez National Recreation Area, which included the Brown Placer Mining Claims. 16 U.S.C. § 460jjj(a)-(b). Under the JNRAA, "no patents shall be issued after May 30, 1991, for any location or claim made in the recreation area under the mining laws of the United States," id. § 460jjj-2(a)(1), and "[s]ubject to valid existing rights, after October 12, 1993, lands within the recreation area [were] withdrawn from location under the general mining laws and from the operation of the . . . mineral material disposal laws," id. § 460jjj-2(b).

9

The Act directed "any party claiming to have been deprived of any property right" to file a claim against the United States in the Court of Federal Claims. Id. § 460jjj-2(a)(2). The Act also directed the Secretary of Agriculture "to examine all unpatented mining claims, including those for which a patent application has been filed, within the recreation area. Upon determination by the Secretary of Agriculture that the elements of a contest are present, the Secretary of the Interior shall immediately determine the validity of such claims." Id. § 460jjj-2(d). Finally, "[n]o mining activity involving any surface disturbance of lands or waters within [the recreation area] . . . shall be permitted except in accordance with requirements imposed by the Secretary [of Agriculture], including requirements for reasonable reclamation" that would restore lands as close as possible to their "premining condition." Id. § 460jjj-2(c).

The Cook family filed a takings claim in the Court of Federal Claims, contending that the JNRAA deprived them of their vested property interest in the mining patents they expected to receive. Cook v. United States, 37 Fed. Cl. 435, 438 (1997); Cook v. United States, 42 Fed. Cl. 788, 789 (1999). In January 1999, the Court of Federal Claims granted the Cook family partial summary judgment on the takings claim for Brown Pacer Mining Claims numbered 9-12 (the El Cajete mine). The court concluded the patent application "claim[ed] discovery of a locatable mineral" ("valuable and marketable" +3/4" pumice, "'unique' because of its size, purity, and lack of discoloration or staining qualities") and the

10

Government could not prove that the Cook family failed to comply with the "terms and conditions entitling them to a patent." Cook, 42 Fed. Cl. at 793, 795.

Meanwhile, pursuant to § 460jjj-2(d), the FS examined the validity of the Cook family's 23 unpatented mining claims. The FS did not contest the validity of the claims that formed the El Cajete mine. The FS issued a mineral report in 1995 that concluded that +3/4" pumice from claims 9-12, "used in the garment finishing industry, is locatable under the 1872 Mining Law . . . and should be administered under regulations at 36 CFR 228 Subpart A." Aplt. App. at 27.

The FS contested the validity of the remaining 19 claims. The agency contended that the pumice on these remaining claims was not a "valuable mineral deposit" because it was not marketable: any pumice from these claims would exceed the already declining demand for pumice in the garment finishing industry. In August 1999, an administrative law judge from Department of the Interior's Office of Hearings and Appeals agreed with the FS and concluded these remaining 19 claims were null and void for failure to discover a valuable mineral deposit within the limits of each claim. Aple. Supp. App. at 50-68.

On April 4, 2002, the Cook family and Copar entered into a settlement agreement with the FS that resolved the takings claim. The FS agreed to pay nearly $4 million in compensation, which "include[d] just compensation, all interest, attorneys fees and costs, and any other litigation expenses." Aplt. App. at 73. Had the Cook family's mining claims been patented, both common and

11

uncommon variety pumice could have been mined; therefore, part of the $4 million payment was compensation for "any right [Copar] may have had to dispose of common variety pumice from Brown Placer Mining Claims 9-12." Aple. Br. at 12. The parties withdrew all pending litigation, and the Cook family and Copar relinquished the other 19 unpatented claims. The FS agreed that the Cook family and Copar "will retain Brown Placer Mining Claims Nos. 9-12 as unpatented mining claims subject to all pertinent statutes and regulations," and the Cook family and Copar acknowledged they were "prohibited from the disposal of the common variety pumice produced from Brown Placer Mining Claims Nos. 9-12 pursuant to 16 U.S.C. § 460jjj-2(b)." Aplt. App. at 74.

*El Cajete Mining Operations and the "Use" of +3/4" Pumice*

The parties began developing plans for operating the El Cajete mine while this prior litigation was ongoing. In December 1996, Copar submitted a "Plan of Operations for Mining Activities on National Forest Lands" for FS approval. Id. at 60. The plan of operations provided a detailed overview of the mining activities as well as the environmental protection measures that Copar would undertake. The plan stated that "[f]or the total life of the project, approximately 10 years, it is anticipated that 1,000,000 tons of +3/4 inch pumice will be mined." Id. at 64. "The common variety pumice that will not be removed from the pit" would be used to "contour the pit to a less than 30% slope as mining progresses westward." Id. at 63. On November 20, 1997, the FS approved the plan of

12

operations "for a period of 10 years or until Nov. 19, 2007." Id. at 71.

Copar also submitted an "El Cajete Pumice Mine Monitoring Plan." Id. at 56. Among other requirements, the monitoring plan detailed how FS personnel would ensure that only +3/4" pumice left the El Cajete mine for processing, "check pumice trucks to inspect haul tickets to verify their origination and destination of haul," and "verify that pumice trucks are covered properly." Id. at 58. As the district court noted, neither the plan of operations nor the monitoring plan expressly required that all of the +3/4" pumice produced from the El Cajete mine be used exclusively in the garment finishing industry.

The dispute in this case originated less than one year into production. In September 1998, the FS advised Copar that "selling pumice from the El Cajete mine for common variety purposes has significant implications regarding the locatability of the mineral and future administration of the El Cajete Mine." Aple. Supp. App. at 49. "In the past" the FS "had no specific indications from Copar that there was any plan to use the +3/4" pumice for use other than in the garment finishing market." Id. at 48. Recent events, however, caused the FS to believe that Copar was operating under the belief that the +3/4" pumice "could be sold for any purpose."[2] Id. The FS warned Copar that this was not the case, and requested "from Copar some means of verification that the pumice removed from

[2] One event was Mr. Cook's testimony during an administrative hearing that "if the Guaje mine were depleted, he would 'probably' sell the El Cajete pumice to supply his (common variety) customers." Aple. Supp. App. at 48.

13

the El Cajete mine is currently and continually selling for garment finishing uses, at a value above that of construction grade pumice in general." Id. at 49.

In subsequent correspondence with Copar during October 2002 and March 2003, the FS stressed that "any pumice removed which does not go to the laundry industry is common variety, and the removal is a violation of the Jemez National Recreation Act and the 36 CFR part 228 regulations." Aplt. App. at 78. Copar had recently lost access to its Guaje Canyon mine, which placed Copar "in a bind" for common variety pumice. Aple. Supp. App. at 73. Although the FS was processing Copar's application for alternate access to the Guaje Canyon mine "as expeditiously as possible," the FS reminded Copar that it was prohibited from removing common variety pumice from El Cajete. Id. The FS was also unwilling to "consider any application to expand the El Cajete mine until [it had] received verifiable evidence of the amount of pumice Copar . . . [was] selling into the laundry industry." Aplt. App. at 79. "Confirming the final use of the pumice is of utmost importance, and to date, Copar . . . has not cooperated in providing any documentation showing the pumice is going for the laundry industry." Id. at 78.

Copar met with the FS in early May 2003, and agreed to develop a proposed method for verifying that its +3/4" pumice was being sold for a locatable use. Aple. Supp. App. at 76. However, Copar failed to provide the FS with any proposed system of verification, and on October 31, 2003, the FS sent Copar another letter that gave Copar fifteen days to provide the FS with a

14

"verifiable method of proving all of the pumice produced from the El Cajete Mine since April 4, 2002 (the date of the settlement agreement) has been used only in the stonewash laundry industry and the pumice continuing to be mined today is being used only in the stonewash laundry industry." Id. at 83. After Copar disagreed with the FS's interpretations of its regulations and did not comply, the FS issued the Notice of Noncompliance on December 23, 2003.

The Notice of Noncompliance declared that Copar's "failure to provide verifiable proof of the stonewash laundry industry use of the pumice removed from the El Cajete Mine as requested in our letter of October 31, 2003 is noncompliance with the U.S. Forest Service regulations," and concluded that "[t]he removal of pumice in excess of the stonewash laundry industry pumice is unnecessarily causing injury, loss or damage to surface resources by causing surface disturbance exceeding what is necessary to extract stonewash laundry industry pumice." Id. at 90. "To correct this noncompliance," the Notice required Copar to produce "complete records since April of 2002 showing how much pumice was removed each month (total production, not just stonewash laundry industry pumice), and the names and contact information for the purchasers of the pumice." Id. at 91. In accordance with 36 C.F.R. § 228.4(e), the Notice also required Copar to submit a modification to its plan of operations that would essentially restrict the company to mining only the +3/4" pumice it could prove "is being used in the stonewash pumice industry." Id.

15

Copar filed an administrative appeal challenging the Notice of Noncompliance. The FS affirmed its decision to issue the Notice of Noncompliance on November 21, 2005, and declined to conduct a discretionary review on December 6, 2005.

Copar then filed a "Petition for Review and Reversal of Agency Decision" in the United States District Court for the District of New Mexico, seeking "review and a reversal" of the "decision to issue and subsequently affirm the Notice of Noncompliance." Id. at 155. Copar sought a declaration that these agency actions were an unconstitutional taking, in violation of the APA because of their "numerous and significant violations of the principles of reasoned decision making," "in excess of statutory jurisdiction and authority and without observance of procedure," and arbitrary and capricious. Copar also sought to enjoin the enforcement of these agency actions and to enter a stay "prohibiting modifications to El Cajete Plan of Operations until this present case is resolved and for such other relief as this Court deems just and proper." Id. at 170-71. The district court denied Copar's petition for review in a memorandum opinion. Following the district court's decision, Copar produced its records for FS inspection.[3] Aplt. Reply at 25; see also Aple. Br. at 41 n.7.

---

[3] After reviewing those records, the FS issued Copar a Notice of Indebtedness in June 2009, which declared that Copar and its president, Kelly Armstrong, owed the FS $8,743,416.49. The FS claimed this amount represented the value of pumice that Copar removed from El Cajete from April 2002 through

(continued...)

16

It is undisputed that Copar has sold a portion of its +3/4" pumice for common variety uses. FS correspondence indicates that Copar's president, Kelly Armstrong, and its Operations Manager, Richard Bell, "stated the pumice was not all going for locatable uses." Aplt. App. at 78, 111. FS meeting notes indicate that Armstrong admitted Copar was "crushing El Caj[e]te pumice to meet their common variety needs and it makes her sick to crush the valuable pumice." Aple. Supp. App. at 79. Finally, Richard Bell explained in an affidavit that Copar's Guaje Canyon mine "provided the primary source . . . of common variety pumice for alternate markets." Aplt. App. at 111. Copar's "decision to sell processed materials from El Cajete Mine was largely made necessary" when the FS revoked "Copar's use of Forest Road 57 to access [its] Guaje Mine." Id. Copar became "unable to fulfill its ongoing obligations to supply its customers," and would not "abandon its established commercial relationships." Id.

---

[3](...continued)
November 2007 without authorization or legal right.

We previously denied Copar's "Motion to Supplement [the] Administrative Record" with this Notice of Indebtedness, but Copar has asked us to reconsider. Mindful that judicial review of agency action "generally focuses on the administrative record in existence at the time of the agency's decision," Forest Guardians v. U.S. Forest Serv., 579 F.3d 1114, 1131 (10th Cir. 2009), we nonetheless consider the Notice of Indebtedness as relevant "background information" that informs our understanding of the factual context in this case, e.g., Asarco, Inc. v. U.S. E.P.A., 616 F.2d 1153, 1160 (9th Cir. 1980) (explaining that reviewing courts can go outside the administrative record to "consider evidence relevant to the substantive merits of the agency action only for background information"). We therefore GRANT Copar's Motion to Supplement the Administrative Record.

II

Before addressing the merits of this case, we first consider whether the expiration of Copar's plan of operations moots Copar's challenge to the requirements the FS imposed in the Notice of Noncompliance.

The FS approved Copar's plan of operations on November 20, 1997 "for a period of 10 years or until Nov. 19, 2007." Aplt. App. at 71. The plan expired while this case was pending in this court. Days before the scheduled oral argument in this case, the FS filed a "Suggestion of Mootness" arguing that this case "must be dismissed" as moot. Fed. Aples' Suggestion of Mootness at 3. "Because the plan has expired," the FS reasoned, "Copar cannot operate its mine, and its activities therefore can no longer be affected by the order that Copar challenged." Id. at 5. The motion filed by the FS was taken under advisement, and the case proceeded to oral argument.

During oral argument, we questioned the FS about the existence of a live controversy concerning the Notice of Noncompliance's requirements that Copar produce its mining and sales records and that Copar submit a modification to its plan of operations. While the FS insisted that a live controversy did not exist with the modification requirement, the agency acknowledged that a live controversy potentially existed over the agency's authority to demand mining and sales records. Copar had produced its records, but the FS considered those records incomplete. The FS also explained that it expected Copar to demonstrate

18

that it disposed of its pumice into a qualifying market, and a showing by Copar that it sold its +3/4" pumice to wholesalers at a price reflective of the mineral's distinct and special value as a stonewashing agent would be a step towards compliance.

Copar filed a "Response to Suggestion of Mootness" that argued this case was not moot because the FS "still insists that the Notice is valid," and our determination that the FS improperly imposed its "end-use limitation and verification requirements" would "alter the 'real world' legal relationship" between the parties. Aplt.'s Resp. to Suggestion of Mootness at 2, 5, 6.

Article III of the United States Constitution limits the jurisdiction of federal courts to actual cases or controversies, U.S. Const. art. III, § 2, cl. 1; therefore, "[t]o qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed," Arizonans for Official English v. Arizona, 520 U.S. 43, 67 (1997) (citation and quotations omitted). When changed circumstances extinguish a plaintiff's legally cognizable interest during the pendency of a case, the case becomes moot and may require dismissal. Kan. Judicial Review v. Stout, 562 F.3d 1240, 1245 (10th Cir. 2009). "[A] case properly brought in the first instance only becomes moot where 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" Building & Constr. Dep't v. Rockwell Int'l Corp., 7 F.3d 1487, 1491 (10th Cir. 1993) (quoting

19

County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)).  "The core question in mootness inquiry is whether granting a present determination of the issues offered will have some effect in the real world."  Kennecott Utah Copper Corp. v. Becker, 186 F.3d 1261, 1266 (10th Cir. 1999) (citation, quotation, and alteration omitted).  Demonstrating mootness is a "heavy" burden, Davis, 440 U.S. at 631, and that burden "lies with the party asserting mootness."  Finstuen v. Crutcher, 496 F.3d 1139, 1150 (10th Cir. 2007) (quotation and citation omitted).

Applying these principles, we conclude that the expiration of Copar's plan of operations has "completely and irrevocably eradicated the effects" of the plan modification requirement set forth in the Notice of Noncompliance.  Davis, 440 U.S. at 631.  Were we to determine that the FS improperly required Copar to modify its plan of operations, that ruling would have no effect on the parties' relationship because that plan has already expired.  Copar's challenge to that requirement is therefore moot.

However, we conclude that the expiration of the plan of operations does not moot Copar's challenge to the Notice of Noncompliance's record production requirement.  Unlike the modification requirement, the record production requirement did not expire with the plan of operations; as the FS indicated during oral argument, the parties dispute the completeness of the records Copar produced to the FS.  This dispute not only concerns the FS's authority to demand Copar's records, an authority that is predicated upon the FS's interpretation of its

20

regulations, but also concerns the extent to which the FS can require Copar to verify the end-use of its pumice. Because determining these issues will affect the parties' relationship, Copar's challenge to this requirement is not moot.

Having concluded that Copar's challenge to the Notice of Noncompliance's record production requirement is not moot, we now consider the merits of this challenge.

## III

Years of litigation concerning the JNRAA's impact on the Cook family's 23 mining claims ended with a settlement agreement on April 4, 2002. Copar and the Cook family retained their unpatented claims comprising El Cajete "subject to all pertinent statutes and regulations," and acknowledged that the JNRAA prohibited them from "dispos[ing] of the common variety pumice produced" from those claims. Aplt. App. at 74. But despite this settlement agreement, and despite repeated admonitions by the FS that +3/4" pumice not destined for the garment finishing industry was merely common variety pumice, Copar has essentially circumvented the settlement agreement by selling a portion of its +3/4" pumice for common variety uses, and has been largely unresponsive to the FS's repeated requests for a proposed method of verifying the end-use of El Cajete pumice. Now, in the face of final agency action demanding mining and sales records as a means of verifying end-use, Copar assails the FS's Notice of Noncompliance, and the underlying interpretation of FS regulations, as arbitrary

21

and capricious, an abuse of statutory and regulatory authority, and an unconstitutional taking. Having reviewed the applicable statutes, pertinent regulations, and the entire administrative record, we reject each of these challenges and affirm the district court's denial of Copar's petition for review.

A

"We review *de novo* the district court's decision in a case brought pursuant to the APA." Wyoming ex rel. Crank v. United States, 539 F.3d 1236, 1244 (10th Cir. 2008). Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In performing arbitrary and capricious review, we accord agency action a presumption of validity; the burden is on the petitioner to demonstrate that the action is arbitrary and capricious. Sorenson Commc'ns, Inc. v. F.C.C., 567 F.3d 1215, 1221 (10th Cir. 2009). Agency action is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency action "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Though probing and in-depth, arbitrary and capricious review is "narrow in

22

scope." Sorenson Commc'ns, 567 F.3d at 1221. We do not "substitute [our] judgment for that of the agency," and we do not "supply a reasoned basis for the agency's action that the agency itself has not given." State Farm, 463 U.S. at 43 (quotation and citation omitted).

The Notice of Noncompliance's record production requirement is predicated on the FS's interpretation that under its regulations, "a mineral is [an] uncommon variety only if it *both* has special value *and* is used for an application that requires the unique qualities that give it distinct and special value." Aple. Br. at 23 (italicized in original). Copar argues that this interpretation is arbitrary and capricious because it is inconsistent with the Common Varieties Act, FS regulations, and mining law precedent. Copar also argues that the record production requirement is arbitrary and capricious because it is a radical departure from prior practice, it is vague, and compliance is impracticable. We reject each of these challenges in turn.

1

Our review of an agency's interpretation of its own regulations is "substantially deferential." St. Anthony Hosp. v. U.S. Dep't of Health & Human Servs., 309 F.3d 680, 691-92 (10th Cir. 2002). Rather than "decide which among several competing interpretations best serves the regulatory purpose," we give the agency's interpretation "controlling weight unless it is plainly erroneous or inconsistent with the regulation." Thomas Jefferson Univ. v. Shalala, 512 U.S.

504, 512 (1994) (citations and quotations omitted); see also Fed. Express Corp. v.

Holowecki, 552 U.S. 389, 397 (2008); Auer v. Robbins, 519 U.S. 452, 461

(1997). Therefore, we "must defer to the Secretary's interpretation unless an

alternative reading is compelled by the regulation's plain language or by other

indications of the Secretary's intent at the time of the regulation's promulgation."

Thomas Jefferson Univ., 512 U.S. at 512 (citations and quotations omitted).

The FS's interpretation centers on the meaning of subsections (c), (d), and

(e) of 36 C.F.R. § 228.41, which became effective on January 16, 1991. 55 Fed.

Reg. 51700 (Dec. 17, 1990). The Department of Agriculture promulgated these

additions, among others, "to end the long standing confusion and

misinterpretation of what is a common variety of mineral," and to "bring

consistency to classification of mineral materials." 55 Fed. Reg. at 51700. In the

Final Rule statement, the Department of Agriculture's response to a public

comment illustrated how these regulatory additions classify minerals as common

or uncommon variety based on their "actual use."

> One respondent raised a concern about the requirement that minerals must be actually used for the purposes stated and indicated that if a "[c]laimant can demonstrate the likelihood of profitability penetrating the market for (uncommon varieties), the deposit will support a valid mining claim despite (present) 'common variety' use." In support of this view, the respondent made an analogy to how the discovery test is employed in dealing with locatable minerals. We disagree. As discussed later, we believe the use of a mineral should play a determinative role in establishing whether or not it is considered to be a common variety. As many minerals may be suitable for both common and uncommon variety uses, actual use must be the basis of a classification, and this is

24

<u>confirmed by administrative and court decisions</u>.

55 Fed. Reg. at 51703 (emphasis added) (alterations in original).

Consistent with a classification system based on the actual use of the mineral, subsections (c), (d), and (e) of § 228.41 provide a sort of field guide for determining whether a mineral qualifies as a common or uncommon variety. Subsection (c) of this regulation indicates that the "Disposal of Mineral Materials" regulations contained in Subpart C, which implement the Materials Act of 1947 and the Common Varieties Act of 1955, apply to "common varieties of . . . pumice, . . . and other similar materials. Such mineral materials include deposits which, although they have economic value, are <u>used</u> for agriculture, animal husbandry, building, abrasion, construction, landscaping, and similar <u>uses</u>." 36 C.F.R. § 228.41(c) (emphasis added). For each of the categories listed in subsection (c), the regulation provides "representative examples" of uses that would qualify a mineral as a common variety. <u>See, e.g.</u>, <u>id.</u> § 228.41(c)(3) ("*Abrasive materials*. This category includes . . . minerals <u>used for</u>: Filing; scouring; polishing; sanding; and sandblasting." (underlining emphasis added)).

Subsection (d) identifies the minerals that are not subject to Subpart C's regulations, and are instead subject to location according "to the terms of the United States Mining Laws, . . . on those portions of the National Forest System where those laws apply." <u>Id.</u> § 228.41(d). "Mineral materials do not include any mineral <u>used</u> in manufacturing, industrial processing, or chemical operations for

25

which no other mineral can be substituted due to <u>unique properties giving the particular mineral a distinct and special value</u> . . . ." <u>Id.</u> § 228.41(d) (emphasis added). Subsection (d) includes seven examples of minerals that would qualify under this subsection; the regulation employs similar phraseology in describing each example that emphasizes how actual use, and not the mere suitability for use, governs this classification. <u>See, e.g.</u>, <u>id.</u> § 228.41(d)(5) ("Gypsum <u>suitable and used</u> for wallboard, plaster, or cement." (emphasis added)). Because these "uncommon variety" minerals are subject to location under the General Mining Law, the "Locatable Minerals" regulations contained in Subpart A govern their extraction from National Forest System Lands.

Finally, Subsection (e) explains how the particular use of a mineral can transform an otherwise common variety mineral into an uncommon variety. "A use which qualifies a mineral as an uncommon variety under paragraph (d) overrides classification of that mineral as a common variety under paragraph (c) of this section." <u>Id.</u> § 228.41(e)(2).

In light of this regulatory language, and in light of the Department of Agriculture's intent in promulgating § 228.41(c)-(e), it was not plainly erroneous or inconsistent for the FS to conclude from its regulations that an "uncommon variety" mineral becomes a common variety mineral when it is no longer used in an application that emphasizes its distinct and special value. To qualify as an uncommon variety mineral under subsection (d), a mineral must be "suitable and

26

used" in an application "for which no other mineral can be substituted due to the unique properties giving the particular mineral a distinct and special value." Id. § 228.41(d). The portion of +3/4" pumice that Copar has sold for common variety uses does not meet this definition because it is not being used in an application that emphasizes its distinct and special value. In this situation, this particular +3/4" pumice becomes a common variety mineral – i.e., a deposit with some economic value that is used in a generic application – that Copar acknowledged it has no authority to mine.

Copar argues that the FS's interpretation is contrary to the Common Varieties Act. Copar contends that 30 U.S.C. § 611 "constitutes a legislative declaration that *deposits* of the minerals listed . . . which are *valuable* because of some 'distinct and special value' are 'valuable mineral deposits' within the meaning of the General Mining Law." Aplt. Reply at 5-6 (quoting 30 U.S.C. § 611) (italicized in original). According to Copar, the FS's interpretation is therefore "inconsistent with th[is] legislative declaration[]" because the agency "seeks to exclude a portion of the otherwise unique, uncommon El Cajete deposit from the operation of the General Mining Law." Id. at 5. This argument is misplaced because it ignores how the regulations, and the FS's interpretation of those regulations, require an uncommon variety mineral to possess "a distinct and special value." 36 C.F.R. § 228.41(d). This argument is also misplaced because it ignores the posture of this case. Acting pursuant to its delegated authority, see

27

30 U.S.C. § 601, the Department of Agriculture has promulgated regulations that identify the circumstances in which a common variety mineral on National Forest System lands remains locatable under the General Mining Law. Copar does not challenge the regulations themselves, only the FS's interpretation of them. Because we have already determined that the FS's interpretation was not clearly erroneous or inconsistent with its regulations, we reject this argument.

Copar also argues that subsections (c) and (d) of § 228.41 are "simply a guide," and that because the regulations do not expressly define the term "uncommon variety," we should focus on Subpart C's definition of mineral materials, which "excludes *entire deposits* of minerals according to their 'distinct and special value' – and not according to the end use." Aplt. Reply at 6-8 (italicized in original). Subpart C defines "mineral materials," in pertinent part, as "common varieties of . . . pumice, . . . and other similar materials," but notes that "[c]ommon varieties do not include deposits of those materials which are valuable because of some property giving them distinct and special value . . . ." 36 C.F.R. § 228.42. We also reject this argument because the regulatory definition of "mineral materials" does not decide the interpretative issue in this case. Though § 228.41(d) is not a formal definition of "uncommon variety," that subsection identifies the circumstances in which a mineral on National Forest System lands remains subject to location under the General Mining Law, and is therefore controlling in this case. Moreover, the regulations refer to § 228.41(d)

28

as the de facto definition of uncommon variety. See id. § 228.41(e)(2) ("A use which qualifies a mineral as an uncommon variety under paragraph (d) overrides classification of that mineral as a common variety under paragraph (c) of this section." (emphasis added)).[4]

Copar contends that two Interior Board of Land Appeals decisions ("IBLA"), United States v. Multiple Use, Inc., 120 I.B.L.A. 63 (1991), and Mid-Continent Res., Inc. Pitkin Iron Corp., 148 I.B.L.A. 370 (1999), "refute the argument that the government may regulate or restrict the actual end-uses of uncommon variety materials." Aplt. Br. at 23. These decisions are not persuasive because neither of them interprets the FS regulations contained in 36 C.F.R. Part 228. Instead, each decision cites and discusses the BLM's prior regulation that defined common variety minerals, e.g., 43 C.F.R. § 3711.1(b)

_____

[4] Copar contends the FS's interpretation is inconsistent with another Subpart C regulation which states that "[t]itle to the mineral materials vests in the purchaser or permittee immediately before excavation . . . ." 36 C.F.R. § 228.43(d) (emphasis added). This regulation is irrelevant because it only applies to "mineral materials;" it does not indicate when title would vest for uncommon variety minerals.

Copar also contends the FS's interpretation conflicts with 36 C.F.R. § 228.43(f). This regulation is also irrelevant because it simply addresses how the end-use classification system in § 228.41(c)-(e) impacted mining claimants when the system was promulgated. The Department of Agriculture promulgated § 228.43(f) alongside § 228.41(c)-(e). 55 Fed. Reg. at 51706. For mining claimants holding claims located for mineral materials, § 228.43(f) granted these claimants the option of "maintaining that the mineral is locatable and filing for patent." Otherwise, "[a]ll mining claimants holding mining claims located in good faith on or before January 16, 1991" for mineral materials "may accept the classification and, if appropriate," dispose of the "mineral material" under Subpart C by "receiv[ing] a sale by negotiated contract." Id. § 228.43(f).

(2001), which provided that "[m]ineral materials which occur commonly shall not

be deemed to be 'common varieties' if a particular deposit has distinct and special

properties making it commercially valuable for use in a manufacturing, industrial,

or processing operation." See Mid-Continent Res., 148 I.B.L.A. at 376-77;

Multiple Use, 120 I.B.L.A. at 76-79.  The IBLA has often applied this regulation

with a standard that the Ninth Circuit articulated in McClarty v. Sec'y of Interior,

408 F.2d 907 (9th Cir. 1969), which set forth five guidelines for distinguishing

between common and uncommon variety minerals.[5]  See David Q. Tognoni, 138

I.B.L.A. 308, 312 (1997) (citing examples).  As Copar repeatedly emphasizes in

its briefings, the IBLA in Multiple Use engaged in a lengthy discussion of the

uncommon variety nature of pumice under the BLM's regulation and the

McClarty analysis.  Multiple Use, 120 I.B.L.A. at 76-79, 96-104.  However, the

important distinction in this case is that here we are analyzing the interpretation

of a different regulation that does not wholeheartedly embrace the McClarty

standard.  In promulgating its classification system based on actual use of the

mineral, the Department of Agriculture recognized that McClarty "has been

---

[5] Those guidelines are (1) "there must be a comparison of the mineral deposit in question with other deposits of such minerals generally;" (2) "the mineral deposit must have a unique property;" (3) "the unique property must give the deposit a distinct and special value;" (4) "if the special value is for uses to which the ordinary varieties of the mineral are put, the deposit must have some distinct and special value for such use;" and (5) "the distinct and special value must be reflected by the higher price which the material commands in the market place."  McClarty, 408 F.2d at 908.

regarded as definitive and . . . has provided a broad framework." 55 Fed. Reg. at 51700. Nevertheless, the FS concluded that "[u]se of the standards established in the <u>McClarty</u> decision leaves a number of unanswered questions for the operator and the Forest Service."[6] <u>Id.</u> (underlining added).

Finally, Copar also argues that the FS's interpretation is contrary to the "elementary tenet of mining law that the locatability of a mineral deposit . . . is determined as of the *date* of withdrawal of the land from location or as of the date of a contest hearing and in certain cases, both." Aplt. Reply at 14 (italicized in original). Each of the cases Copar cites answers the factual question of whether a mining operator had discovered a valuable deposit of common variety minerals before Congress withdrew those minerals from the public domain when it enacted the Common Varieties Act on July 23, 1955.[7] The IBLA decisions Copar cites acknowledge that "the question of present marketability must be determined by

---

[6] As further support for the dissimilarity between the BLM's and the FS's standard, we note that the BLM recently codified the <u>McClarty</u> guidelines. 43 C.F.R. § 3830.12(b); <u>see also</u> 68 Fed. Reg. 61046, 61048 (Oct. 23, 2003) (incorporating the former § 3711.1 into the new § 3830.12). In expressly adopting the <u>McClarty</u> standard, the BLM indicated how the agency "modified the language in some sections from the proposed rule so that they more closely match the language and intent of applicable case law. For example, to define uncommon varieties of mineral materials, we rely on the court's decision in <u>McClarty</u>." 68 Fed. Reg. at 61048.

[7] <u>See</u> <u>Rawls v. United States</u>, 566 F.2d 1373, 1375-76 (9th Cir. 1978); <u>Charlestone Stone Prods., Inc. v. Andrus</u>, 553 F.2d 1209, 1214-15 (9th Cir. 1977), <u>rev'd on other grounds</u>, 436 U.S. 604 (1978); <u>Clear Gravel Enters., Inc. v. Keil</u>, 505 F.2d 180, 181 (9th Cir. 1974) (per curiam); <u>Barrows v. Hickel</u>, 447 F.2d 80, 82-84 (9th Cir. 1971); <u>Palmer v. Dredge Corp.</u>, 398 F.2d 791, 795 (9th Cir. 1968).

31

reference to the date on which the claimant fulfilled all of the prerequisites to the making of the entry, i.e., no later than the date of the issuance of the final certificate." United States v. Whittaker (On Reconsideration), 102 I.B.L.A. 162, 166 (1988). These decisions simply do not inform the interpretative issue in this case: whether a mineral extracted from National Forest System lands can lose its status as an uncommon variety mineral when it is no longer used in an application that utilizes its distinct and special value.[8]

2

Copar additionally argues that we should set aside the Notice of Noncompliance's record production requirement as arbitrary and capricious. Copar insists that the Notice "requires Copar to produce an *ex-post facto* 'accounting' of all the El Cajete pumice produced," and this "'end-use verification' requirement" is arbitrary and capricious because it is "a radical departure from prior practice," it is vague, and compliance is "impractical and

---

[8] Copar also argues that the FS's interpretation is arbitrary and capricious because Copar mines "block pumice," and the FS "simply has no statutory authority whatsoever to regulate the 'end-use' of block pumice." Aplt. Br. at 20-21. Under the Common Varieties Act, the term "common varieties" "does not include so-called 'block pumice' which occurs in nature in pieces having one dimension of two inches or more," 30 U.S.C. § 611, and under FS regulations, "block pumice" is subject to location under the General Mining Law if "it is valuable and used for some application that requires such dimensions," 36 C.F.R. § 228.41(d)(6). We agree with the FS that Copar has provided no evidence demonstrating that the pumice it sells for common variety uses is block pumice. Copar only alleges that approximately 15% of the El Cajete deposit is block pumice. Aplt. Br. at 20 n.6.

oppressive given the nature of the pumice market and industry practices." Aplt. Br. at 29, 32 (italicized in original). Because none of these arguments find support in the administrative record, we accordingly reject them.

Copar's monitoring plan and its plan of operations did not require Copar to sell its +3/4" pumice exclusively to the garment finishing industry, or to maintain records of its sales. In its September 9, 1998 letter, the FS explained why it never memorialized those requirements in those documents. "In the past" the agency "had no specific indications from Copar that there was any plan to use the +3/4" pumice for use other than in the garment finishing market." Aple. Supp. App. at 48. When those indications surfaced, the FS requested "some means of verification that the pumice removed from the El Cajete mine is currently and continually selling for garment finishing uses." Id. at 49 (emphasis added).

In light of Copar's admission that "the pumice was not all going for locatable uses," the FS in subsequent correspondence stressed that "[c]onfirming the final use of the pumice is of utmost importance" and reminded Copar that it "ha[d] not cooperated in providing any documentation showing the pumice is going for the laundry industry." Aplt. App. at 78. Copar met with the FS in early May 2003, and agreed to develop a proposed method for verifying end-use. Later that month, the FS told Copar that it "look[ed] forward to reviewing [Copar's] suggestions on how to bring this operation into compliance," acknowledged the difficulty in developing a proposed method of verification, and suggested

33

potential accommodations:

> As mentioned during the meeting, there is no formal agency direction on how to implement 36 CFR 228.41. On their face, the regulations require a "mine-to-end use" accounting for uncommon variety minerals. We recognize the laundry pumice market is very competitive and some information must remain confidential. We also recognize many clothing manufacturers/laundries are very sensitive to any publicity about their use of domestic pumice in the laundry process. Copar's use of distributors, instead of marketing the pumice directly to the end users, also complicates the situation because tracking the use will require the distributors to disclose where and to whom the pumice is sold. An accounting logically requires the operator's cooperation, either by providing verifiable reports of the material produced and sold, or by opening their books to audit by the Forest Service. In Copar's case, the accounting would not only be of Copar's sales to the distributors, but the distributors' sales to the end users. If you prefer, we may be able to approve, after consultation with counsel, an alternative proposal that would provide an independent third-party certification if it could satisfy our responsibility for verification of use.

Aplt. App. at 81. E-mail communications confirm that Copar was working on a proposal to verify the use of its pumice during the summer of 2003. Aple. Supp. App. at 74-77.

On October 31, 2003, not having received any proposal from Copar, the FS demanded that Copar provide the agency with "a <u>verifiable method of proving</u> all of the pumice produced from the El Cajete Mine since April 4, 2002 (the date of the settlement agreement) has been used only in the stonewash laundry industry and the pumice continuing to be mined today is being used only in the stonewash laundry industry." Aplt. App. at 83 (emphasis added). When Copar did not comply, the FS issued its Notice of Noncompliance on December 23, 2003. The

34

Notice stated that Copar's "failure to provide verifiable proof of the stonewash laundry industry use of the pumice removed from the El Cajete Mine . . . is noncompliance." Id. at 90 (emphasis added). "To correct this noncompliance," the FS demanded that Copar "[p]rovide . . . complete records since April of 2002 showing how much pumice was removed each month (total production, not just stonewash laundry industry pumice), and the names and contact information for the purchasers of the pumice." Id. at 91.

On the record presented, we reject Copar's argument that the record-production requirement is a departure from prior practice. Though the plan of operations and monitoring plan did not require Copar to sell its +3/4" pumice exclusively to the garment finishing industry, at that time the agency was unaware that Copar intended to sell its El Cajete pumice for common variety uses. Upon learning that Copar intended to do so, the FS has consistently sought "some means of verif[ying]" the end-use of Copar's pumice. Aple. Supp. App. at 49.

We also reject Copar's argument that by including the term "verifiable proof" in the Notice of Noncompliance, the FS imposed a vague standard. Copar's "failure to provide verifiable proof" caused its noncompliance, but "[t]o correct this noncompliance" the Notice specifically required Copar to produce its mining and sales records, including "the names and contact information for the purchasers of the pumice." Aplt. App. at 91. This requirement is not vague.

Nevertheless, Copar argues that the FS is insisting "that El Cajete pumice

35

be tracked to its ultimate end use," and that this requirement is impracticable and oppressive given the nature of the garment finishing industry. Aplt. Br. at 29. Copar argues that it lacked notice of this requirement because the FS never included it within the plan of operations and monitoring plan; thus, the "retroactive proof of end-use information" the FS seeks "is not within Copar's possession, custody or control, but rather, is known by third parties and end users themselves." Aplt. Br. at 31. Copar claims it cannot obtain this information because it sold most of its El Cajete pumice to "brokers who will not disclose the identity of their customers" because such disclosure "could result in the broker's loss of that customer or by the bypassing [of] the broker." Id. at 30.

We reject this argument because it is inconsistent with the administrative record. The final agency action that Copar is challenging in this case did not demand proof that "*every single ounce* of pumice removed from the El Cajete mine was actually used in the stonewash laundry industry." Aplt. Br. at 34 (italicized in original). Rather, the Notice of Noncompliance requested mining and sales records and "the names and contact information for the purchasers of the pumice." Aplt. App. at 91. Production of these records avoids the impracticalities and difficulties that Copar alleges. And demonstrating the price that Copar received for its pumice also avoids these alleged concerns. As the FS explained during oral argument, the agency expects Copar to demonstrate that it disposed of its pumice into a qualifying market, and a showing by Copar that it

36

sold its pumice to wholesalers at a price that reflects the mineral's distinct and special value would be a step towards compliance. Sold as a stonewashing agent, Copar's +3/4" pumice commands a price significantly higher than the price it would fetch if sold for common variety application: the 1995 mineral report indicated that "[b]ulk shipments for garment finishing pumice sell for $20-54 per cubic yard (f.o.b.) as compared to the range of $5.50-12.00 per cubic yard (f.o.b.) for common variety pumice," App. at 27, and Copar emphasized a similar price disparity at oral argument. Given the economic realities of the pumice market, we expect that the price Copar received for its +3/4" pumice would be a significant, if not dispositive, step towards verifying disposition into a qualifying market. Therefore, the degree of end-use verification the FS ultimately seeks will likely not require Copar's distributors to disclose the identities of their customers.

Finally, the administrative record simply does not support Copar's assertion that it was unaware of the FS's requests for verification. Copar knew as early as September 1998 that the FS wanted "some means of verif[ying]" the end-use of El Cajete pumice. Aple. Supp. App. at 49. Moreover, the administrative record reveals that the FS persistently requested end-use verification, and was amenable to developing a verification method that would not upset the confidential nature of the pumice market. Shortly after Copar agreed to develop a method of verification in May 2003, the FS acknowledged the difficulties of this process, and highlighted the potential for an "alternative proposal that would provide an

37

independent third-party certification if it could satisfy our responsibility for verification of use." Aplt. App. at 81. Though an agency acts arbitrarily and capriciously when the agency "entirely fail[s] to consider an important aspect of [a] problem," State Farm, 463 U.S. at 43, here the FS did not act arbitrarily and capriciously in consistently articulating its request for end-use verification, attempting to work with Copar in developing a proposed verification method, and ultimately selecting a degree of verification that will not encroach upon Copar's alleged concerns. Accordingly, we reject Copar's arguments that the Notice of Noncompliance's record production requirement was arbitrary and capricious.

B

Copar alternatively argues that the FS lacks the authority to regulate the end-use of its +3/4" pumice, and therefore the FS exceeded its authority in issuing the Notice of Noncompliance. Because the APA empowers reviewing courts to set aside agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), an essential function of our review under the APA is determining whether an agency acted within the scope of its authority, Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1574 (10th Cir. 1994). Having reviewed the regulations, we conclude that the FS acted well within its authority in issuing the Notice of Noncompliance.

Copar argues that the FS has "determined, as a matter of policy, that the scope of its regulatory authority does *not* extend to the disposition of minerals

38

post production." Aplt. Br. at 36 (italicized in original). Copar quotes a portion of the FS Manual that states the FS's "function is the management and protection of surface resources in a manner compatible with reasonable and logical mining operations and *not the management of mineral resources*." Id. at 37 (quoting Aplt. App. at 144) (italicized in original). Copar contends that the FS's authority "to inspect mining operations is for the purpose of determining if activities are being carried out in accordance with the [p]lan of [o]perations." Id. Because Copar fully complied with its plan of operations, the FS therefore "overstepped its authority" in issuing the Notice of Noncompliance and in reaching the "nonsensical" conclusion that Copar's mining activities were causing "irreparable injury" to surface resources. Id. at 37, 44.

The logical flaw in Copar's argument is the assumption that compliance with a plan of operations equates to compliance with the FS regulations. By mandating that FS officials inspect mining operations for compliance "with the regulations in this part <u>and</u> an approved plan of operations," the regulations clearly indicate that compliance with a plan of operations and compliance with the regulations are separate and distinct obligations. See 36 C.F.R. § 228.7(a) (emphasis added). In addition, the FS explained to Copar in the agency's May 21, 2003 letter that "a [p]lan of [o]perations does not exempt the operator from compliance with the other mineral regulations." Aplt. App. at 81.

Copar's argument also ignores how the regulations explicitly task the FS

39

with ensuring that mining operations "shall be conducted so as to minimize adverse environmental impacts on National Forest System surface resources." 36 C.F.R. § 228.1; see also 16 U.S.C. § 460jjj-2(c) ("No mining activity involving any surface disturbance of lands or waters within [the Jemez National Recreation Area] . . . shall be permitted except in accordance with requirements imposed by the Secretary [of Agriculture]"). Charged with this responsibility, it was not nonsensical for the FS to conclude, in spite of Copar's compliance with its plan of operations, that the "removal of pumice in excess of the stonewash laundry industry pumice is unnecessarily causing injury, loss or damage to surface resources by causing surface disturbance exceeding what is necessary to extract stonewash laundry industry pumice." Aplt. App. at 90. According to the settlement agreement, Copar retained the unpatented mining claims comprising El Cajete "subject to all pertinent statutes and regulations," and acknowledged it could not extract common variety pumice. Aplt. App. at 74. We have already determined that it was not arbitrary and capricious for the FS to conclude that the portion of +3/4" pumice Copar did not sell to the garment finishing industry qualified as common variety pumice. Therefore, in carrying out its mining operations Copar used and destroyed more surface resources than the company was allowed to consume.

Finally, Copar's argument ignores how the regulations permit the FS to serve a Notice of Noncompliance upon a mine operator when that operator "fails

40

to comply with the regulations . . . and the noncompliance is unnecessarily or unreasonably causing injury, loss or damage to surface resources . . . .  Such notice shall describe the noncompliance and <u>shall specify the action to comply</u> and the time within which such action is to be completed . . . ."  36 C.F.R. § 228.7(b) (emphasis added).  In light of this provision, the FS did not exceed its authority in issuing the Notice of Noncompliance to Copar, and in demanding that Copar produce its mining and sales records from El Cajete.

C

Copar's final argument for setting aside the Notice of Noncompliance is that the FS's interpretation of its regulations is an unconstitutional taking because it "transform[s] locatable uncommon variety pumice into common variety pumice through an end-use analysis."  Aplt. Br. at 43.  Under the APA, reviewing courts shall set aside agency action that is "contrary to constitutional right."  5 U.S.C. § 706(2)(B).  Because constitutional questions arising in a challenge to agency action under the APA "fall expressly within the domain of the courts," we review de novo whether agency action violated a claimant's constitutional rights.  <u>Darden v. Peters</u>, 488 F.3d 277, 283-84 (4th Cir. 2007).

Copar relies on <u>Forbes v. Gracey</u>, 94 U.S. 762, 765 (1876), in which the Supreme Court determined that under the then-existing mining laws, title to extracted minerals vests in the mining operator "the moment th[e] ore becomes detached from the soil in which it is embedded."  Copar contends the FS's

41

interpretation deprives the company of its vested right in the +3/4" pumice not destined for the garment finishing industry. But as the district court reasoned, the rule from Forbes assumes that the extracted minerals were subject to location. Copar acknowledged in the settlement agreement that it had no right to extract common variety pumice from El Cajete. Because it was not arbitrary and capricious for the FS to conclude that the portion of Copar's +3/4" pumice that is not destined for the garment finishing industry is common variety pumice, Copar had no right to extract common variety pumice, and therefore no taking occurred.

IV

For the foregoing reasons, the judgment of the district court is AFFIRMED. Copar's Motion to Supplement the Administrative Record is GRANTED. The FS's Suggestion of Mootness is GRANTED in part and DENIED in part.